**Tim EMBERTON, Appellant,**

v.

**GMRI, INC., f/k/a General Mills Restaurants, Inc. (d/b/a Red Lobster Restaurant # 349), et al, Appellees.**

Nos. 2007–SC–000443–DG,
2008–SC–000109–DG.

Supreme Court of Kentucky.

Oct. 29, 2009.

Rehearing Denied Jan. 21, 2010.

Casey Alan Hixson, Stephen L. Hixson, Bowling Green, KY, Counsel for Appellant.

Matthew Porter Cook, Stefan Richard Hughes, Cole & Moore, P.S.C., Bowling Green, KY, Counsel for Appellees.

Opinion of the Court by Justice SCOTT.

This is an appeal from a Court of Appeals' opinion reversing the Judgment of the Warren Circuit Court in favor of Appellant/Cross–Appellee, Tim Emberton ("Emberton"), on the grounds that his personal injury action against Appellee/Cross–Appellant, GMRI Inc. ("GMRI"), was untimely filed and thus barred by the statute of limitations. For reasons that GMRI actively concealed Emberton's probable cause of action, we hold that his suit was timely filed. Having also addressed GMRI's cross-appeal, we reverse the decision of the Court of Appeals and reinstate the judgment of the Warren Circuit Court.

### Background

This is a case arising from a restaurant exposing a customer to hepatitis A, causing him to contract the virus. Upon discovering the probable cause of his illness, the customer filed suit against the restaurant and one its employees, as well as against the local health department and several of its employees.[1] The customer asserted three claims against the restaurant sounding in negligence, products liability, and breach of warranty. The relevant facts are as follows.

As had become customary in his family, Tim Emberton, a forty-two year old resident of Glasgow, celebrated his mother-in-law's birthday on July 28, 2001, at the local Red Lobster restaurant (# 349) owned by GMRI in Bowling Green, Kentucky. Later, on August 27, Emberton began exhibiting fever, chills, fatigue, and dark urine. He was admitted to the hospital three days later and released on September 5, 2001. On his discharge, Emberton was informed that blood tests revealed he was suffering from hepatitis A, a viral infection of the

1. The health department and its employees were subsequently dismissed from the suit by virtue of qualified official immunity.

liver. Asking his family physician as to how he could have contracted the virus, Emberton was told that hepatitis A was spread by fecal-oral contact and that the source of his infection "could be anywhere."

On the day Emberton dined at Red Lobster, a young server, Carissa Phelps, worked her entire shift. Though she did not know it at the time, she was infected with hepatitis A. And though GMRI had a stringent handwashing policy in effect at the restaurant, Phelps was not shown the training tape and was unaware of its handwashing guidelines. GMRI management failed to conduct Phelps' mandatory performance reviews and never noticed whether she washed her hands after using the restroom.

Twelve days after Emberton's dinner, Phelps arrived at the restaurant sick and vomiting. She was sent home by her manager and later diagnosed with hepatitis A. In fact, during this time, several cases of hepatitis A surfaced in the Bowling Green area.[2]

As required by law, the health department was informed of each case of hepatitis A. Tina Loy was one of four nurses at the Barren River District Health Department, forming an epidemiology team selected to investigate the occurrences of hepatitis A. Loy and the epidemiology team were charged with investigating the time, place, and source of the various complainants' exposure to the virus. This is often done by asking an infected patient a series of standardized questions that serve to identify their personal contacts, health history, eating history, lifestyle, and risk factors. With this information, the team creates an investigative matrix that serves to identify what the various hepatitis A patients had in common and thus the likelihood of where they may have been infected.

GMRI's response to Phelps' infection was largely dictated by the restaurant's established policy to inhibit public notification of on-site hepatitis A infections. Consequently, GMRI's management ordered all the restaurant's employees not to discuss the infection with anyone and assured the health department's epidemiology team that Phelps' hygiene was good. The management did not disclose that Phelps' fellow employees had seen her touching food with her bare hands, eating from the ice cream, and drinking directly from a milk carton.

By late August of 2001, the health department had traced seven hepatitis A cases to GMRI's restaurant. Though the health department could never confirm whether Phelps actually transmitted the virus to the infected patrons, she was the only employee there to test positive for hepatitis A. Eventually, approximately thirteen cases were tied to the restaurant, all of which had no other link to a known outbreak.[3] The health department elected not to notify the public of their findings.

Upon Emberton's discharge from the hospital, he was contacted by Loy and the epidemiology team in their efforts to determine how he had contracted the virus. During the interview, he included Red Lobster as one of the restaurants at which he had eaten in past weeks. Though the

2. Though all other GMRI employees tested negative for the virus, all employees were subsequently administered immune globulin to keep those exposed from further suffering and spreading the virus.

3. The outbreak at GMRI's restaurant was, in fact, part of an even larger community outbreak between May of 2001 and May of 2002. During this time, the health department identified over eighty cases of hepatitis A from several different sources.

health department already knew a likely source for his infection, Emberton was not informed of the other infections pointing to GMRI's restaurant.

Approximately a month later, Emberton's recovery stalled and he was again contacted by Loy, this time for additional tests. Still not indicating any particular source for Emberton's illness, the health department assured him that they were still trying to find exactly how he had acquired the virus through RNA analysis and that he would be contacted if there was anything he needed to know. Emberton never heard back from the health department and made no further inquiry into the source of his infection. His recovery took seven months.

Nearly three years later, in May of 2004, Emberton discovered the probable cause of his illness. He was then contacted by attorney Stephen Hixson, who had come across Emberton's name in separate litigation against GMRI. Hixson was representing a Bowling Green resident who had fallen ill with hepatitis A a week after Emberton.[4] In the course of discovery, Hixson found that Emberton was one of about thirteen different health department patients that had eaten at the restaurant in the late summer of 2001.[5] It was at this time that Emberton first became aware that Phelps was the likely source of his

hepatitis A infection and that both GMRI management and the health department officials knew about the restaurant's 2001 outbreak. Suit was filed against GMRI in August of 2004.

At trial, the jury found that GMRI's employee, Phelps, had complied with her legal duty but that GMRI had violated one or more of its duties causing Emberton to contract hepatitis A. The jury awarded Emberton $8,666.05 for medical expenses and $225,000 for pain and suffering. The trial court, accordingly, entered judgment on October 5, 2005, in the amount of $233,000. GMRI filed several post-trial motions, all of which were denied.[6]

On appeal, the Court of Appeals reversed the judgment of the trial court on grounds that Emberton's suit was not filed within the one-year statute of limitations period. This Court granted Emberton's Motion for Discretionary Review relating to the statute of limitations issue and subsequently granted GMRI's Cross–Motion for Discretionary Review relating to its claims of error in the trial below.

*Analysis*

A. Emberton's Suit Was Timely Filed

On direct appeal, Emberton contends that the decision of the Court of Appeals

4. Robert Fitch became ill in early September of 2001 after dining at the restaurant. Just prior to the one-year anniversary of his illness, Fitch happened to read in the local newspaper that an individual had filed a lawsuit claiming that the same restaurant had caused him to contract hepatitis A during the same time period as Fitch. Fitch retained Hixson and suit was filed immediately.

5. Ultimately, seven suits, including Emberton's, were filed against GMRI. It is unknown whether the other six potential victims were ever aware of the outbreak at the restaurant. All of the suits, with the exception of Emberton's, were settled.

6. GMRI's motions included: (1) motion for judgment notwithstanding the verdict based upon Emberton's alleged failure to file his lawsuit within the applicable one-year statute of limitations; (2) motion for a new trial, arguing that the verdict was inconsistent, that the trial court committed evidentiary errors, and that the pain and suffering award was excessive and unsupported by the evidence; (3) motion to reduce the amount of damages through remittitur; (4) motion to hold KRS 360.040 unconstitutional; and, (5) a motion to reduce the post-judgment interest rate to either zero or to a more reasonable amount.

must be reversed and the judgment of the trial court reinstated because the Court of Appeals failed to apply Kentucky's discovery rule to his injury. In the alternative, Emberton argues that GMRI actively concealed his cause of action so as to toll the statute of limitations period. We hold that GMRI did actively obstruct Emberton's discovery of his cause of action so as to make his suit timely. Because it is dispositive of the issue, we see no need to consider arguments concerning the discovery rule.

Prior to trial, GMRI moved for summary judgment, alleging that Emberton had failed to file his suit within the one-year statute of limitations, pursuant to KRS 413.140(1)(a).[7] In response, Emberton filed an affidavit, explaining that, in spite of his attempts, he did not discover the source of his illness until May of 2004.[8] The trial court overruled GMRI's motion and concluded that:

> [E]mberton knew that he had been harmed. He knew that. He readily knew that he had been harmed. But that is not the definition. The question is whether or not he was injured ... It was not until he realized that he had been injured [that the limitations period began to run]. That's the way I'm going to rule on it ... I think that the *Wiseman* [*v. Alliant Hospitals*, 37 S.W.3d 709 (Ky.2000)] case is enough on point in this matter that it's within the statute of limitations. So I'm going to overrule the motion for summary judgment.

Following judgment, GMRI moved for judgment notwithstanding the verdict, again asserting the statute of limitations as a bar to Emberton's cause of action. After a hearing, the trial court overruled GMRI's motions.

GMRI then appealed and the Court of Appeals reversed the judgment of the trial court, concluding that Emberton had failed to file his suit within the statutory period. In reaching this decision, the Court of Appeals held that Kentucky's discovery rule did not apply to Emberton's injury and that he failed to investigate the source of his illness when reasonable diligence could have revealed the likely tortfeasor within the statutory period.[9] Emberton's cause of action, therefore, accrued when he was diagnosed with hepatitis A, making his suit two years too late.

We note at the outset of our analysis that "[w]here the pertinent facts are not in dispute, the validity of the defense of the statute of limitations can and should

7. KRS 413.140 ("Actions to be brought within one year"), in relevant part, states:

 (1) The following actions shall be commenced within one (1) year after the cause of action accrued:
 (a) An action for an injury to the person of the plaintiff ...

8. The dates of his exposure, diagnosis, and filing suit are not in dispute.

9. The Court of Appeals cited to the following passage from *McLain v. Dana Corp.*, 16 S.W.3d 320, 326 (Ky.App.1999), for its reasoning:

 Under Kentucky law, the discovery rule provides that a cause of action accrues when the injury is, or should have been, discovered. However, the discovery rule does not operate to toll the statute of limitations to allow an injured plaintiff to discover the identity of the wrongdoer unless there is fraudulent concealment or a misrepresentation by the defendant of his role in causing the plaintiff's injuries. A person who has knowledge of an injury is put on "notice to investigate" and discover, within the statutory time constraints, the identity of the tortfeasor.
 (citing *Michels v. Sklavos*, 869 S.W.2d 728, 732 (Ky.1994); *Resthaven Mem'l Cemetery, Inc. v. Volk*, 286 Ky. 291, 150 S.W.2d 908, 912 (1941); *McCollum v. Sisters of Charity of Nazareth Health Corp.*, 799 S.W.2d 15, 19 (Ky.1990)).

be determined by the court as a matter of law." *Lynn Min. Co. v. Kelly,* 394 S.W.2d 755, 759 (Ky.1965) (*citing Carr v. Texas Eastern Transmission Corp.,* 344 S.W.2d 619 (Ky.1961)); *accord Hall v. Musgrave,* 517 F.2d 1163 (6th Cir.1975). Here, as was the case in *Louisville Trust Co. v. Johns–Manville Products,* the parties concede that "there is no dispute concerning the operative facts concerning the time elements involved." 580 S.W.2d 497, 501 (Ky.1979). Accordingly, we address the issue as one of law: whether Emberton's injury was time barred by KRS 413.140(1)(a).

■ Generally, "[t]he Kentucky General Assembly and this Court have long recognized the value of statutes which 'bar stale claims arising out of transactions or occurrences which took place in the distant past.'" *Munday v. Mayfair Diagnostic Lab.,* 831 S.W.2d 912, 914 (Ky.1992) (*quoting Armstrong v. Logsdon,* 469 S.W.2d 342, 343 (Ky.1971)). As such, "provisions of statutes of limitations should not be lightly evaded." *Id.* (*citing Fannin v. Lewis,* 254 S.W.2d 479, 481 (Ky.1952)).

As we explained in *Munday,* however, none of this is to say that the statute is not without exceptions. *See id.* (citing cases). The most pertinent exception to our discussion here is that which Emberton advances on appeal: concealment or obstruction, as expressed in KRS 413.190(2). *See generally Roman Catholic Diocese of Covington v. Secter,* 966 S.W.2d 286, 290 (Ky. App.1998) (applying the statute). In relevant part, KRS 413.190(2) provides that

> [w]hen a cause of action mentioned in [KRS 413.140(1)(a) ] accrues against a resident of this state, and he by ... concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the ... obstruction shall not be computed as any part of

the period within which the action shall be commenced.

This "tolling statute has been on our books for many years" and "is essentially a recognition in law of an equitable estoppel or estoppel in pais to prevent a fraudulent or inequitable resort to a plea of limitations." *Adams v. Ison,* 249 S.W.2d 791, 793 (Ky. 1952); *see also Munday,* 831 S.W.2d at 914 ("Long ago a tolling statute was enacted which provides that a resident of this State who absconds or conceals himself 'or by any other indirect means obstructs the prosecution of the action' shall not have benefit of the statute of limitation so long as the obstruction continues.") (*quoting* KRS 413.190(2)).

■ For purposes of the statute, "though deception is involved, bad faith, evil design or an intent by the wrongdoer to deceive or mislead or defraud in the technical sense is not essential." *Adams,* 249 S.W.2d at 793. Rather, and in order to toll the limitations period, the concealment envisioned by KRS 413.190(2) must represent an "affirmative act" and "cannot be assumed"—i.e., it must be active, not passive. *Id.; accord Munday,* 831 S.W.2d at 915. For this reason, we have held that the statute's reference to "other indirect means" of obstruction of an action still requires an act or conduct that remains "affirmatively fraudulent": "The 'other indirect means' of obstruction ... must consist of some act or conduct which in point of fact misleads or deceives plaintiff and obstructs or prevents him from instituting his suit while he may do so." *Adams,* 249 S.W.2d at 792 (*citing Reuff–Griffin Decorating Co. v. Wilkes,* 173 Ky. 566, 191 S.W. 443, 444 (Ky.1917)); *accord Gailor v. Alsabi,* 990 S.W.2d 597, 603 (Ky. 1999). As a result, "mere silence ... is insufficient" and cannot support its application. *Gailor,* 990 S.W.2d at 603; *see also* L.S. Tellier, Annotation, *What consti-*

*tutes concealment which will prevent running of statute of limitations,* 173 A.L.R. 576 5th § 12 (2009) ("The rule is quite generally accepted, particularly in modern cases, that ... an affirmative act on the part of the defendant tending toward concealment is necessary, and that passivity, such as silence on his part, is not sufficient, in order to constitute such a concealment as to toll the statute of limitations.").

We note that the most commonly recognized exception to the affirmative act requirement applies where "a party remains silent when *the duty to speak or disclose* is imposed by law" upon that person. *Gailor,* 990 S.W.2d at 603 (*citing Munday,* 831 S.W.2d at 914) (emphasis added); *see also Munday,* 831 S.W.2d at 914 ("[W]here the law imposes a duty of disclosure, a failure of disclosure may constitute concealment under KRS 413.190(2), or at least amount to misleading or obstructive conduct."). In *Munday,* for example, a legal duty was imposed by statute. 831 S.W.2d at 915. In *Adams,* a fiduciary duty was imposed by virtue of the doctor-patient relationship. 249 S.W.2d at 793; *see also Security Trust Co. v. Wilson,* 307 Ky. 152, 210 S.W.2d 336, 339–40 (Ky.1948) (fiduciary duty). And, in *Secter,* too, a legal duty was imposed by statute to disclose acts of "child abuse to law enforcement authorities." 966 S.W.2d at 290.

 Returning to the case at bar, we hold that the actions of GMRI in actively directing the concealment of Phelps' hy-

giene, work habits, and exposure at the restaurant during the investigation constituted an affirmative act of concealment so as to obstruct Emberton's discovery and prosecution of his likely cause of action. The record demonstrates that District Manager, James Finley, was instrumental in not only suppressing the fact of Phelps' hepatitis A infection, but also the gravity of her potential exposure to the restaurant's patrons. When interviewed by the health department's epidemiology team, Finley assured them that Phelps' hygiene was good and they later testified that they believed him. What he did not disclose is that he had never met Phelps or that her employees had previously witnessed her obvious lack of appropriate hygiene. Finley ordered all of Red Lobster's employees not to discuss Phelps' infection with anyone and he disbursed free coupons to members of the health department in the apparent hope that his cooperation would keep the matter from public exposure.[10] When later confronted with a concerned customer questioning why all of Red Lobster's employees appeared to have similar band-aids on their arms,[11] Finley responded that "there was not any health risk to anyone," and, as he later admitted, successfully persuaded the customer that there was no need to go "to the press" because his "crew" may have been donating blood at the health department. After this exchange, Finley later boasted, "[the customer] started thinking that we could be doing something charitable." Taken as

10. We acknowledge that similar conduct did not amount to active concealment in *Rigazio v. Archdiocese of Louisville,* 853 S.W.2d 295, 297 (Ky.App.1993) ("Griffith's action in instructing [the victim] not to tell anyone [about past sexual abuse] does not amount to such obstruction."). Yet, for two reasons, *Rigazio* is distinguishable. First, this was the *only* evidence of alleged concealment in *Rigazio. See id.* And, second, we believe that there is a qualitative difference between a tortfeasor or-

dering others not to disclose an injury and, on the other hand, a tortfeasor ordering the potential plaintiff not to disclose his injury: in the latter case, the potential plaintiff knows of his injury as well as its cause.

11. The band-aids, in fact, served to cover the employees' puncture marks from recent immune globulin treatment.

a whole, we believe Finley's conduct on behalf of GMRI was intentionally deceptive and designed to prevent public disclosure of Phelps' infection through the health department, the restaurant's employees, and its patrons.

Consequently, the limitations period began only when GMRI's concealment was revealed or when Emberton should have discovered his cause of action by reasonable diligence. *Adams*, 249 S.W.2d at 793 ("The statute begins to run only when the fraud or concealment is revealed or the facts discovered or should have been discovered by the exercise of reasonable diligence by the injured" plaintiff); *see also Secter*, 966 S.W.2d at 290 ("'Obstruction might also occur where a defendant conceals a plaintiff's cause of action so that it could not be discovered by the exercise of reasonable diligence.'") (*quoting Rigazio*, 853 S.W.2d at 297). Because the concealment was revealed to Emberton in May of 2004, the only question that remains is whether Emberton should have discovered his claim prior to that time.

Given GMRI's active concealment and the sparse knowledge available to Emberton prior to meeting with Hixson, we cannot say that he should have. Finley's comprehensive and systematic suppression of Phelps' hepatitis A diagnosis and her exposure to customers served to effectively cut off any public disclosure of that fact, one which certainly would have apprised a patron like Emberton that his illness could have originated at the restaurant. The two primary means of disclosing that information—the restaurant's employees and the health department—were either ordered not to do so or were not given a complete and truthful account of Phelps' hygiene and exposure to others. When one of the restaurant's customers suspected ongoing health concerns, she was misled, thereby preventing informal disclosure. In no discussion with the health department was Emberton given any indication that the restaurant was anymore likely the source of his infection than the numerous other possible sources involving fecal-oral contact. Moreover, he was assured that he would be contacted should significant information develop. Without any such notice, Emberton reasonably relied upon his doctor's assurances that he could have contracted the virus "anywhere." With only that knowledge at hand,[12] we cannot say that Emberton should have investigated his illness further.

Accordingly, we hold that KRS 413.140(1)(a) was tolled for the effective time of the concealment, ending in May of 2004. Therefore, Emberton's suit, filed three months later, was timely and not barred by the statute of limitations.

■■■ Before moving on, however, we must address GMRI's suggestions that Emberton's concealment argument and, indeed, the very basis of our holding here, is not properly preserved. Though GMRI rightly notes that Emberton did not make this argument to the Court of Appeals, his failure to do so does not prevent our review. Emberton, as a successful appellee, fundamentally had no claim of error to make or preserve at the Court of Appeals. 5 C.J.S. *Appeal and Error* § 971 (1995) (*citing Mueller v. Elm Park Hotel Co.*, 391 Ill. 391, 63 N.E.2d 365, 368–69 (Ill.1945)).

12. GMRI's claims that Emberton failed to take notice of media reports on the matter are unfounded. The only news report revealed in the record is a single 2002 account in Bowling Green's *Park City Daily News*, on which Robert Fitch, a Bowling Green resident, based his own discovery. There was no evidence presented that Emberton, a Glasgow resident, ever read the Bowling Green newspaper and there was no evidence presented of any other media involvement in the hepatitis A outbreak at the restaurant in 2001.

Moreover, an appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result. *See e.g. McCloud v. Commonwealth*, 286 S.W.3d 780, 786 n. 19 (Ky.2009) ("[I]t is well-settled that an appellate court may affirm a lower court for any reason supported by the record.") (*citing Kentucky Farm Bureau Mut. Ins. Co. v. Gray*, 814 S.W.2d 928, 930 (Ky.App.1991)); *see Fischer v. Fischer*, 197 S.W.3d 98, 102–03 (Ky.2006) ("Appellee's failure to raise the issue in the Court of Appeals does not prevent Appellant from presenting it here as he had no duty to present it to the Court of Appeals since he defended the trial court decision and it had to be affirmed if it was sustainable on any basis.") (*citing Commonwealth Transp. Cabinet Dept. of Highways v. Taub*, 766 S.W.2d 49 (Ky.1988)); *Am. Gen. Home Equity, Inc. v. Kestel*, 253 S.W.3d 543, 549 n. 11 (Ky. 2008). Indeed, we believe any contrary rule requiring the appellee on appeal to have briefed every conceivable alternative argument for affirming the trial court in the Court of Appeals would inundate our appellate courts with unnecessary cross-appeals and reading than they can do or is necessary. Of even greater concern is that such a requirement could force this Court to affirm and publish an opinion that we know is erroneous for other reasons.

In any event, a review of the record shows that GMRI raised the issue before the Court of Appeals, to wit:

Additionally, [GMRI] did not fraudulently conceal or misrepresent any facts to Emberton. [GMRI] and its employees did not make the decision not to inform the public of Carissa Phelps' illness. It is undisputed that the local health department made that decision pursuant to its guidelines and procedures. There is no legal duty imposed on [GMRI] or any of its employees to go further than local health officials concerning the health and safety notices. [GMRI's] act of complying with the health department's decision not to go public is not fraudulent concealment or a misrepresentation which would toll the statute of limitations. *See Thomson v. McDonald's, Inc.* [180 Ill.App.3d 984, 129 Ill.Dec. 710], 536 N.E.2d 760, 762 (1989) (holding that mere silence by a defendant accompanied by a plaintiff's failure to timely discover a cause of action does not constitute fraudulent concealment); *Munday v. Mayfair Diagnostic Laboratory*, 831 S.W.2d 912, 914 (Ky.1992) (absent a legal duty to speak, proof of fraud requires an affirmative act by the party charged). There was no such affirmative act by [GMRI] in this case and the statute of limitations was not tolled.

GMRI also joined with Appellant, Emberton, to address the issue in its summary judgment motion at the trial court:

Mere silence by a defendant accompanied by a plaintiff's failure to timely discover a cause of action does not constitute fraudulent concealment. *Thomson v. McDonald's, Inc.* [180 Ill.App.3d 984, 129 Ill.Dec. 710], 536 N.E.2d 760, 762 (1989). Ordinarily, proof of fraud requires a showing of an affirmative act by the party charged. *Munday*, 831 S.W.2d at 914. An exception to this general rule may be found in a party's silence when the law imposes a duty to speak or disclose. *Id.* ... [GMRI] cooperated with the local health departments' investigation and did not participate in the decision not to go public with this information. The law does not impose a duty on [GMRI] or its employees to provide notice concerning a health issue such as this above and beyond any decision made by the public health officials who has jurisdiction over the issue. The Plaintiff cannot point this Court to any authority which imposes this duty

on Moving Defendants. The decision not to go public was made by the appropriate health officials. The decision of the Moving Defendants to abide by this decision does not constitute fraudulent concealment and the statute of limitations should not be held tolled.

Indeed, it is difficult to review the parties main arguments over the discovery rule and ignore one of the primary exceptions to it and the statute of limitations—that of active concealment.

### B. GMRI Is Not Entitled To A New Trial

On cross-appeal, GMRI alleges that the trial court below committed several errors warranting a new trial. GMRI argues: (1) that the trial court admitted irrelevant and prejudicial evidence; (2) that the jury verdict below was inconsistent; (3) that the jury awarded an excessive and unsupported amount for pain and suffering; and, (4) that KRS 360.040 is unconstitutional. For these reasons, GMRI contends, the judgment of the Warren Circuit Court must be reversed. We have reviewed each claim but, finding no cause for reversal, we affirm the judgment of the trial court.

### 1. Evidentiary Errors

GMRI first argues that the trial court committed reversible error by erroneously admitting two items of evidence that were allegedly irrelevant or, in the alternative, unduly prejudicial. In this regard, we decline to reverse the decision of the trial court for reasons that it did not abuse its discretion.

Under KRE 401, evidence is relevant if it has any tendency to render the existence of any consequential fact more or less probable, however slight that tendency may be. *See e.g. Turner v. Commonwealth*, 914 S.W.2d 343, 346 (Ky.1996); KRE 401. Because of its obvious value,

relevant evidence is always admissible at trial unless excluded by some other rule. *See e.g. Berryman v. Commonwealth*, 237 S.W.3d 175, 179 (Ky.2007); KRE 402. One such exclusion can be found in KRE 403, where relevant evidence may "be excluded if its probative value is substantially outweighed by the danger of undue prejudice." KRE 403.

The trial court's KRE 401 relevancy determinations and KRE 403 prejudice determinations are reviewed under the familiar abuse of discretion standard. *Love v. Commonwealth*, 55 S.W.3d 816, 822 (Ky.2001) (*citing Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999); *Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky.1998)). We will not conclude that a trial court has abused its discretion unless the trial court's "decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. Applying these legal standards, we now address the evidence that GMRI asserts the trial court erroneously admitted.

The first item of evidence concerns the results of the restaurant's health department inspection on August 23, 2001. Approximately two weeks after Phelps had fallen ill with hepatitis A, the local health department performed a routine inspection of GMRI's restaurant without notice. On this occasion, the restaurant scored a sixty-six (66) out of one-hundred (100), representing a failing grade.

GMRI argues that because the inspection occurred nearly a month after July 28, the results of the inspection were irrelevant as they could not reflect the probable conditions on the night Emberton ate at the restaurant. GMRI also asserts that even if the evidence was relevant, the evidence was so embarrassing and prejudicial

as to substantially outweigh its probative value.

A review of the record persuades us that GMRI's arguments are without merit. Introducing evidence of the health department's subsequent inspection was relevant to Emberton's claims because the failure of the restaurant to maintain a reasonably safe environment for the preparation of food and drink that would be served to its patrons was directly at issue. As to the remoteness of the inspection, it cannot be said that the inspection was so remote in time as to make it irrelevant because it is clear that such a low score does not arise overnight—i.e., it indicates a significantly chronic, rather than acute, condition culminating through weeks of neglect, not days. It also cannot be said that evidence of the health department's inspection was so prejudicial as to make it inadmissible because, as the inspector testified at trial, nothing about the inspection proved extraordinary. No evidence was presented showing any single horrendous or disturbing deviation from health standards that could possibly inflame the jury. Any prejudicial effect the evidence may have had, therefore, was no greater than its probative value to the consequential facts of the case.

◼◼◼◼ The second and final item of evidence that GMRI contends the trial court erroneously admitted was testimony relating to an investigative chart prepared by health department officials. The chart itself was an investigative matrix created by the health department's epidemiology team pursuant to 902 KAR 2:030 § 1(2)(a) and was used by health department officials in isolating the 2001 hepatitis A outbreak in the Bowling Green area.[13] The matrix documented the names of those known to be infected with hepatitis A during the period, categorized the individuals by date of infection and known contacts to the virus, and classified some of the individuals as probable links to the restaurant and others as possible links.[14] In this way, the matrix represented the comprehensive findings that the health department was charged with collecting.

GMRI argues that evidence relating to the chart at trial was irrelevant because it was not scientifically verified and because its certainty could not be established by those who prepared it. GMRI also claims that use of the matrix distracted and prejudiced the jury because it documented unnamed hepatitis A cases.

Again, we cannot agree. To say that the matrix was not scientific or totally accurate is not to say that it was not relevant. There is no argument that the matrix was not duly authenticated. And the matrix need only have any tendency to make the existence of any consequential fact more or less probable, however slight that tendency may be. *Turner*, 914 S.W.2d at 346. Certainly the matrix did this by showing that the restaurant may have been the proximate cause of Emberton's injury in demonstrating that others who similarly dined at the same restaurant fell sick with the same virus. While we concede that alerting the jury of other possible hepatitis

---

**13.** For every case of hepatitis A, 902 KAR 2:030 § 1(2)(a) requires health departments "to investigate and secure data regarding clinical diagnosis, reservoir, and time, place and source of infection and contacts."

**14.** In all, the matrix identified six probable cases and seven possible cases. Probable cases were defined as those who specified eating at GMRI's restaurant during the time that Phelps was contagious. Possible cases were defined as those who could only specify eating at the restaurant in the approximate time period that Phelps was contagious. The primary commonality between the probable and possible cases was that they shared no other known link to hepatitis A exposure.

A cases may have constituted some distraction, we also cannot ignore the fact that the matrix represented the legally-required investigative results of the hepatitis A outbreak by those who were in the best position to do so. That is to say, the probative value of the matrix was so significant as to outweigh its potential prejudice.

### 2. Pain and Suffering Damages

Next, GMRI contends that the trial court erroneously denied its motion for a new trial or modification (remittitur) of the judgment because the pain and suffering damages awarded Emberton were excessive and unsupported by the evidence. Having reviewed the record, we disagree and hold that the trial court's decision was not an abuse of discretion.

 Under CR 59.01(d), a trial court's decision to grant or deny a motion for a new trial based upon an allegedly excessive verdict lies within the discretion of the trial court. *Childers Oil Co., Inc. v. Adkins,* 256 S.W.3d 19, 28 (Ky.2008); *see also Davis v. Graviss,* 672 S.W.2d 928, 932 (Ky.1984) ("This is a discretionary function assigned to the trial judge who has heard the witnesses firsthand and viewed their demeanor and who has observed the jury throughout the trial."). Similarly, under CR 59.05, a trial court's decision to grant or deny a motion to alter, amend, or vacate its judgment lies within the discretion of the trial court. *See Gullion v. Gullion,* 163 S.W.3d 888, 891–92 (Ky.2005) ("[A] trial court has 'unlimited power to amend and alter its own judgments.'"); *accord McMahon v. Libbey–Owens–Ford Co.,* 870 F.2d 1073, 1078 (6th Cir.1989). As such, we review the trial court's decision for an abuse of discretion. *Adkins,* 256 S.W.3d at 28. Due to the delicate context in which these issues most often arise, however, our usual standard of review must be undertaken with an additional consideration:

The amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because we would have reached a different conclusion. If the verdict bears any relationship to the evidence of loss suffered, it is the duty of the trial court and this Court not to disturb the jury's assessment of damages.

*Id.* (*quoting Hazelwood v. Beauchamp,* 766 S.W.2d 439, 440 (Ky.App.1989)). That is to say, we necessarily approach such questions with great caution.

 The evidence presented at trial demonstrated that Emberton suffered a severe hepatitis A infection, causing him great pain and anxiety. In the week prior to entering the hospital, Emberton ran a fever, experienced excruciating abdominal pain, suffered severe fatigue and diarrhea, became jaundiced, and vomited every fifteen to twenty minutes on an empty stomach. Once admitted, Emberton spent over a week in the hospital enduring the symptoms and was administered only the most basic hepatitis A treatment to ward off dehydration, intravenous therapy. Moreover, Emberton testified that his first days in the hospital were especially distressing, as the doctors could not at first determine which form of hepatitis he had contracted. As a result, Emberton was left to await a diagnosis in an isolated and secured room, at times worrying that he could die. Given that his wife worked full time and that he had two children to care for, Emberton told the jury that he was especially worried that his illness could adversely affect his family's financial stability. In addition, testimony from both his boss of twenty-four years and his wife corroborated the long-lasting effects of the illness on Emberton: he continued to suffer fatigue for over six months. Given that evidence and with due deference to the trial court, we cannot say that a pain and suffering award

of $225,000 was "so disproportionate to the evidence so as to" conclude that the trial court erroneously denied GMRI a new trial or remittitur of the damages. *Adkins,* 256 S.W.3d at 29.

### 3. Inconsistent Verdict

GMRI's next claim of error is that the trial court erroneously overruled its motion for a new trial because the jury rendered an inconsistent verdict. Its specific contention relates to the jury's findings on the issue of negligence: GMRI asserts that because the jury found Phelps not liable for Emberton's injury, they could not logically find GMRI liable as they did. In other words, GMRI argues that it cannot be liable for Emberton's injury because only Phelps could have transmitted the virus to Emberton and thus, if the jury finds Phelps not liable, GMRI must also be found not liable. For reasons that the jury's verdict was logically consistent under the law of negligence, we hold that the trial court did not err in denying the motion.[15]

The record shows that the jury was given two separate instructions for the liability of Phelps and GMRI. The relevant instructions were as follows:

### INSTRUCTION NO. 2

First, you will consider the claim against Carissa Phelps. The court instructs you that she was under a legal duty to practice all good hygiene habits and generally to use reasonable care to avoid potentially transmitting disease to customers and coworkers.

If you find that she violated one or more of those duties, and that such violation was a substantial cause in causing Tim Emberton to contract Hepatitis–A,

then you will find a verdict for plaintiff under this instruction. Other wise you will find for Carissa Phelps . . .

### INSTRUCTION NO. 3

Second, you will consider the claim against GMRI, Inc., doing business as Red Lobster Restaurant. The court instructs you that Red Lobster was under a legal duty to instruct Carissa Phelps about the reasonable hygiene practices that should be employed by restaurant servers and to enforce the rules it gave her in that regard, and generally to use reasonable care in conducting its restaurant business to avoid potentially transmitting disease to customers and coworkers.

If you find that Red Lobster violated one or more of those duties, and that such violation was a substantial cause in causing Tim Emberton to contract Hepatitis–A, then you will find a verdict for plaintiff under this instruction. Other wise you will find for Red Lobster . . .

Under Instruction No. 2, the jury was to designate its finding from one of two general conclusions, "We the jury find for Tim Emberton under this instruction," or, "We the jury find for Carissa Phelps under this instruction." The jury found for Phelps. Similarly, under Instruction No. 3, the jury was to designate from one of two general conclusions, "We the jury find for Tim Emberton under this instruction," or "We the jury find for Red Lobster under this instruction." The jury found for Emberton.

In the civil context, "[t]he true test to be applied in reconciling apparent conflicts between the jury's answers is whether the answers may fairly be said to

---

**15.** We also review the denial of a motion for a new trial for an abuse of discretion. *See Davis,* 672 S.W.2d at 932 (The grant or denial of a motion for a new trial pursuant to CR 59.01 is "a discretionary function assigned to the trial judge."); *accord Gray v. Sawyer,* 247 S.W.2d 496, 497 (Ky.1952).

represent a logical and probable decision on the relevant issue as submitted." *Callis v. Owensboro–Ashland Co.*, 551 S.W.2d 806, 808 (Ky.App.1977) (*citing Miller v. Royal Neth. Steamship Co.*, 508 F.2d 1103, 1108 (5th Cir.1975)). "We therefore must attempt to reconcile the jury's findings, by exegesis, if necessary ... before we are free to disregard the jury's verdict and remand the case for a new trial." *Miller*, 508 F.2d at 1107 (*quoting Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)).

▌ Here, the jury could have found that Phelps' conduct constituted a deviation from the standard of care—i.e., negligence—and yet, logically, could still find that her negligent conduct was not the cause of Emberton's injury. This is because negligent liability depends not only upon a finding of negligent conduct but also—as both jury instructions accurately reflected in a dependant clause—upon an additional component: proximate or legal causation. *See e.g. Bayless v. Boyer*, 180 S.W.3d 439, 452 (Ky.2005) (A "party might admit to a deviation from the standard of care but still avoid liability for an injury because the jury determines that the deviation was not the ... proximate cause of the opposing party's injury."); *Deutsch v. Shein*, 597 S.W.2d 141, 143 (Ky.1980) ("Liability for a negligent act follows a finding of proximate or legal cause."). Here, the jury could have found that though Phelps may have, in fact, caused Emberton's injury (i.e., she was the only means of actual transmission), her negligence was merely a foreseeable intervening cause set into motion by the negligence of GMRI.[16] *See NKC Hospitals, Inc., v. Anthony*, 849 S.W.2d 564, 568 (Ky.App.1993) ("A superseding cause is an intervening independent force; however, an intervening cause is not necessarily a superseding cause. We say that, if the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause."); Restatement (Second) of Torts §§ 442(d), 443, and 447 (1965). As a result, the jury could have found that the duties breached by GMRI—and not those breached by Phelps—represented the proximate or legal cause of Emberton's injury so as to incur sole liability.

### 4. KRS 360.040

▌ GMRI's final argument on cross-appeal concerns the legality of KRS 360.040, the state's post-judgment interest statute. GMRI asserts that the statute is unconstitutional because it violates equal protection, Section 115 of the Kentucky Constitution, and the separation of powers doctrine, and because it is void for vagueness. Even if the statute is constitutional, GMRI contends that the trial court erred by failing to reduce the post-judgment interest rate as requested in its post-trial motion. We review these contentions in turn but conclude that each is unpersuasive.

The trial court's judgment below stated that, in addition to the sums the jury awarded Emberton, he was also entitled to "interest at the legal rate of 12% per annum, compounded annually, for which execution may issue." In this respect, the judgment reflected the state's post-judgment interest statute in KRS 360.040, which reads:

A judgment shall bear twelve percent (12%) interest compounded annually from its date. A judgment may be for

---

**16.** We believe this all the more reasonable given that the evidence presented showed that GMRI had failed to instruct Phelps' as to the restaurant's handwashing procedures and subsequently monitor her hygiene in the workplace.

the principal and accrued interest; but if rendered for accruing interest on a written obligation, it shall bear interest in accordance with the instrument reporting such accruals, whether higher or lower than twelve percent (12%). Provided, that when a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than twelve percent (12%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than twelve percent (12%). All interested parties must have due notice of said hearing.

Following entry of the trial judgment, GMRI not only moved the court to declare the statute unconstitutional, but also to reduce the interest rate to either zero or a more equitable sum. After a hearing on these motions, the trial court denied both.

At the outset, we must reject GMRI's claims that our recent decision in *Elk Horn Coal Corp. v. Cheyenne Res., Inc.*, 163 S.W.3d 408 (Ky.2005), wherein this Court found unconstitutional the ten percent penalty provisions of KRS 26A.300, also put into question the validity of KRS 360.040.[17] Unlike that statute, KRS 360.040 is not a penalty, as it is not an "automatic and mandatory" ad hoc assessment. *Id.* at 413. Rather, KRS 360.040 applies interest to an unliquidated judgment by the discretion of the trial court and prior to appeal, giving the appellant ample opportunity to contest the interest rate in a hearing. On the other hand, the function of KRS 26A.300 was not to compensate any delay or use of appellant's money judgment, but to exact a cost for pursuing an appeal without success. *Id.* at 414 ("Penalty statutes, like KRS 26A.300, are not intended to compensate an appellee for delay in receiving a money judgment; rather, such statutes are intended to discourage frivolous appeals.").

■ Moving onto GMRI's more specific contentions, we do not believe that KRS 360.040 violates the equal protection guarantees of the Fourteenth Amendment of the United States Constitution and Section 2 of the Kentucky Constitution. Though GMRI argues that the statute irrationally discriminates between money-judgment appellants and non-money judgment appellants,[18] we believe that the statute treats all similarly situated appellants the same— namely, all those appealing from money judgments.[19] *City of Cleburne v. Cleburne*

---

17. In *Elk Horn Coal*, this Court struck down KRS 26A.300 as a violation of equal protection, *see* 163 S.W.3d at 411–22, and the separation of powers doctrine, *see id.* at 422–24. There, the statute assessed an appellee additional damages in the amount of 10% of a superseded judgment where that appellee's motion for discretionary review proved unsuccessful and the enforcement of the judgment was delayed. *See id.* at 410–11; *cf. Fred Clements, Heating and Air Conditioning Co. v. Janes*, 576 S.W.2d 280, 281 (Ky.App. 1979) ("[D]amages under K.R.S. 26A.300 are properly awarded when a motion for discretionary review is denied.").

18. Though KRS 360.040 distinguishes liquidated demands from unliquidated demands (e.g., damages), GMRI does not challenge this distinction here but only the statute's application of interest to money judgments in general. *See Middleton v. Middleton*, 287 Ky. 1, 152 S.W.2d 266, 268 (1941) ("The rule is that interest runs as a matter of right on a liquidated demand, and, in the case of an unliquidated claim, the allowance of interest rests in the discretion of the ... the court trying the case.") (citations omitted).

19. Ingrained in our conclusion is the belief that a money judgment appellee and a non-money judgment appellee are not similarly situated. We believe that so because the money judgment appellee has won a money award, formalized in a judgment, the deprivation of which may warrant *in kind* compensation in the form of annual interest payments. The same cannot be said of a non-money judgment, such as specific performance or an injunction.

*Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.") (*citing Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)); *cf. Elk Horn Coal*, 163 S.W.3d at 413 ("The ten percent penalty provisions of KRS 26A.300 apply *only* to unsuccessful appellants in second appeals *from superseded money judgments.*") (emphasis in original). Moreover, even assuming that money judgment appellants and non-money judgment appellants are similarly situated, the difference in treatment has a thoroughly rationale basis, *see Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249 (1985) ("The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.") (citations omitted), that has been long recognized by the courts of this state:

> At common law judgments did not bear interest and the purpose of the statute was *to place them upon the same footing as other liquidated demands* and thus *insure compensation to the creditor for the loss of the use of his money* during the period in which he was wrongfully deprived of it.

*Farmer v. Stubblefield*, 297 Ky. 512, 180 S.W.2d 405 (1944) (emphasis added); *accord Stone v. Kentucky Ins. Guar. Ass'n*, 908 S.W.2d 675, 678–79 (Ky.App.1995) ("Our holding ... furthers the general purpose of awarding post-judgment interest, that is, to compensate a plaintiff for the loss of use of money resulting from the defendant's failure to pay after the extent of its obligation has been fixed by a judgment."); *Elk Horn Coal*, 163 S.W.3d at 422 ("KRS 360.040 ... was enacted to compensate for delay."); *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 834, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (compensation for loss of use); *Overbeek v. Heimbecker*, 101 F.3d 1225, 1228 (7th Cir. 1996) (compensation for loss of use). We believe that purpose no less legitimate now.[20]

■ In addition, because KRS 360.040 functions not to automatically penalize the unsuccessful money judgment appellant but to compensate the appellee for the loss of use of his money judgment during the appellate process, we also cannot say that the statute so discourages meritorious appeals as to infringe upon Section 115 of the Kentucky Constitution and its guarantee of an appeal as a matter of right.[21] KRS

---

**20.** For many of these same reasons, we also reject GMRI's related argument that KRS 360.040 constitutes impermissible special legislation under Sections 59 and 60 of the Kentucky Constitution. As stated above, the statute plainly applies to all in the class—those appealing money judgments—the same and the class is treated differently from non-money judgment appellants for no arbitrary reason but for a "reasonable and substantial difference in kind, situation or circumstance which bears a proper relation to the purpose of the Statute." *Schoo v. Rose*, 270 S.W.2d 940, 941 (Ky.1954).

**21.** Even if we assume that KRS 360.040 impermissibly chills the right to appeal, we cannot agree, as GMRI asserts, that CR 73.02(4) is the less restrictive and alternative means of accomplishing its goals. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 51, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("Only where state action impinges on the exercise of fundamental constitutional rights or liberties must it be found to have chosen the least restrictive alternative."). While it may be less restrictive, it is not an alternative means: CR 73.02(4) merely allows appellate courts to award an appellee or respondent damages and costs for appeals and motions so merit less that they appear to have been taken

360.040, by its express terms, authorizes the trial court to hear argument and, in its discretion, lower the post-judgment interest rate from twelve percent in the case of unliquidated damages: "[S]uch judgment may bear less interest than twelve percent (12%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than twelve percent (12%)." *See Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 679 (Ky.App.2000) (no abuse of discretion in lowering interest rate below twelve percent). Indeed, the trial court's discretion in departing from the rate is to be guided by the peculiar equities of the case before it.[22] *Stone*, 908 S.W.2d at 677–78 (*citing Courtenay v. Wilhoit*, 655 S.W.2d 41, 42 (Ky.App.1983)). Moreover, the trial court's decision is not above reproach and may be reviewed for an abuse of discretion. *See Payne*, 24 S.W.3d at 679.

▮ Moreover, KRS 360.040 does not violate the separation of powers doctrine as expressed in Sections 27 and 28 of the Kentucky Constitution. Because this Court in *Elk Horn Coal* struck down KRS 26A.300 as an unconstitutional legislative encroachment upon our appellate jurisdiction granted in Section 110(2)(b) of the Kentucky Constitution, *see* 163 S.W.3d at 423, GMRI argues that KRS 360.040 must also fail. This argument is misguided for two reasons. First, interest rates are a

policy matter properly reserved to the legislature and remain a creature of statute. *Morgan v. Scott*, 291 S.W.3d 622, 644 (Ky. 2009). And, second, this Court held KRS 26A.300 a violation of the separation of powers doctrine in *Elk Horn Coal* because it was, when taken with both KRS 360.040 and CR 73.02(4), so harsh as to deter meritorious appeals—an effect directly limiting "the Kentucky Supreme Court in exercising its jurisdiction to review cases from lower courts," thereby invading the Court's exclusive constitutional power "to 'exercise appellate jurisdiction as provided by *its rules*.'" *Elk Horn Coal*, 163 S.W.3d at 424 (*quoting* Ky. Const. § 110(2)(b)) (emphasis in original). As we have discussed, KRS 360.040 operates for a different purpose and through a more sensitive procedure, all towards allowing meritorious appeals to go forward to this Court.[23]

▮ We also cannot agree, as GMRI argues, that KRS 360.040 is unconstitutionally vague because it does not give the trial court specific guidelines when departing from the presumed post-judgment interest rate in the case of unliquidated damages. Given that the statute permits the trial court to lower the presumed rate of twelve percent only after a hearing on the merit s, the language ("satisfied that the rate should be less") sufficiently indicates that the decision is one *necessarily* left to the sound discretion of the trial court in relying upon the facts before it such that

in bad faith. *See* CR 73.02(4). As such, CR 73.02(4) does not further the primary goal of KRS 360.040, which is to compensate an appellee for the lost use of his money judgment. *Farmer*, 297 Ky. 512, 180 S.W.2d at 405.

22. Though we acknowledge that this consideration developed in the family law context, *see Guthrie v. Guthrie*, 429 S.W.2d 32, 34 (Ky.1968), we think it a consideration inherent in any proper KRS 360.040 hearing on whether to reduce the de facto rate of post-judgment interest.

23. While we still acknowledge that an incidental effect of KRS 360.040 may be to discourage frivolous appeals, *see Elk Horn Coal*, 163 S.W.3d at 422 ("We note that KRS 360.040, which provides judgment interest, and was enacted to compensate for delay, also acts to deter frivolous appeals."), we do not believe that effect so pronounced as to also discourage meritorious appeals, the critical inquiry.

"those who are affected by the statute can reasonably understand what the statute requires of them." *Gurnee v. Lexington–Fayette Urban County Govt.*, 6 S.W.3d 852, 856 (Ky.App.1999). This is not a novel interpretation of the statute in that regard, *see Morgan*, 291 S.W.3d at 644, *Payne*, 24 S.W.3d at 679, and, as we have explained here, may always turn on the particular equities presented. *See Stone*, 908 S.W.2d at 677–78.

■ We must finally reject GMRI's final argument that, notwithstanding the statute's constitutionality, the trial abused its discretion by not reducing the statutory interest rate to either zero or a more reasonable amount, such as that utilized by our federal courts.[24] While, to be sure, KRS 360.040 authorized the trial court to do so, we again cannot say that its choice not to do so was an abuse of discretion. Confronting a similar argument recently advanced in *Morgan*, we held that it was not an abuse of discretion for a trial court to refuse to reduce the post-judgment interest rate in the face of evidence showing lower current market rates because "the fact that a trial court could have chosen to impose a lower interest rate does not necessarily mean that its decision to impose a higher rate was" error. *Morgan*, 291 S.W.3d at 644. "Moreover, the fact that a twelve percent interest rate in today's economic climate may be well above the marketplace norm is a matter properly to be considered by the General Assembly because that body has the power and discretion to lower the de facto legal interest rate contained in KRS 360.040." *Id.* Accordingly, we restate here that GMRI's complaints are better addressed to our legislature and the political process rather than this Court.[25]

Even if we were to accept GMRI's arguments that a trial court must lower the post-judgment interest rate to that popularly reflected by current economic indicators, we fear that the money-judgment appellant's compensation for lost use of his judgment could be substantially devalued and his very right to collect the judgment totally thwarted. In Kentucky, a money judgment is enforceable for fifteen years, *see* KRS 413.090(1), and, in that time, great economic variation can occur, including significant inflation.[26] As a result, while twelve percent may be on the high end of today's market, a current market rate today may also, in time, prove so low as to inadequately compensate the money-judgment appellant awaiting payment. In addition, we note that where the rate of interest is significantly reduced, as would be the case here, it only seems natural that the appellee would have less reason to promptly pay the judgment, which in turn prolongs the appellant's risk of loss by exposing him to greater possibilities of the appellee's (or his surety's, where a supersedeas bond is posted) insolvency. We, therefore, believe that the statute's de facto rate reflects the realities of constantly changing financial conditions over the life of a money judgment and the inability of a trial judge—indeed, anyone—to predict the future.

24. *See* 28 U.S.C. § 1961(a).

25. KRS 360.040 was last amended in 1982 when the General Assembly raised the post-judgment interest rate to its current twelve percent rate from eight percent. Recent attempts have, in fact, been made to amend the statute to a lower rate of interest but to no avail. *See* S.B. 104, 2009 Gen. Assem., Reg. Sess. (Ky.2009); H.B. 487, 2009 Gen. Assem., Reg. Sess. (Ky.2009).

26. In this way, we simply remain aware that interest consists of several components, such as coverage for inflationary trends, the devaluation of the dollar, risk of non-collection, as well as profit.

*Conclusion*

For the forgoing reasons, the decision of the Court of Appeals is hereby reversed and the judgment of the Warren Circuit Court is reinstated.

All sitting. CUNNINGHAM, NOBLE, SCHRODER, and VENTERS, JJ., concur.

MINTON, C.J., and ABRAMSON, J., concur in result only.