RENDERED: DECEMBER 18, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1112-MR

PEGGY L. & BRYAN C. BARBER;
GERALD J. & HELEN M. NICOLAS; AND
SHEILA M. & DAVID J. MCLAUGHLIN                    APPELLANTS


|         | APPEAL FROM JEFFERSON CIRCUIT COURT |
|---------|-------------------------------------|
| v.      | HONORABLE ANN BAILEY SMITH, JUDGE   |
|         | ACTION NOS. 18-CI-006708 AND 19-CI-000019 |


TOPGOLF USA LOUISVILLE, LLC;
TANNER MICHELI; GGP, INC.;
CHARLES TAPIA; WMB 2, LLC;
TWB OXMOOR 2, LLC; HOCKER
OXMOOR, LLC; LOUISVILLE AND
METRO PLANNING COMMISSION;
LOUISVILLE/JEFFERSON COUNTY
METRO GOVERNMENT; AND THE
LEGISLATIVE COUNCIL OF
LOUISVILLE/JEFFERSON COUNTY
METRO GOVERNMENT                                    APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: This is a land use appeal involving a map amendment, conditional use permit, and several variances to allow a golfing and entertainment complex in an abandoned portion of Oxmoor Center in Louisville, Kentucky. The appellants are nearby residents of the area, and they filed suit versus the Louisville/Jefferson County Planning Commission (Planning Commission) and Louisville/Jefferson County Metro Council (Metro Council), challenging the actions of those entities, in Jefferson Circuit Court. The circuit court affirmed the decisions of the Planning Commission and Metro Council and dismissed the residents' appeals. We affirm.

We shall rely upon the statement of the facts and procedural history as set forth in the circuit court's June 20, 2019, opinion and order:

> Topgolf operates in cities nationwide and bills itself as a "family friendly entertainment venue that features fun and accessible golf games for all ages and ability levels." "Topgolf features multi-level, climate-controlled driving bays, complete with HDTVs, a popular music playlist, a carefully crafted food menu, and full bar service." The site for the proposed venture is in the space in Oxmoor Center that a Sears store abandoned since October of 2017. "The Topgolf development will be one part of a broader redevelopment of the southern section of Oxmoor Center that will include three new restaurants, an open plaza area and Topgolf." The defendants claim that "Topgolf will bring hundreds of new jobs and will induce further economic development to the area."

Topgolf began the process that led to the instant appeal on February 19, 2018, when it requested a change in zoning of the proposed site by filing a "Change in Zoning/Form District Pre-Application" with the Planning Commission. The name placed on the form, in the column titled "Applicant" and in the space designated "Name," was "Tanner Micheli"; in the space immediately beneath the "Name" space titled "Company," was placed the name "Topgolf USA Louisville, LLC," with an address in Dallas, Texas.[1] Mr. Micheli is the Director of Real Estate for Topgolf International, Inc. and operated as the point person for the Louisville development with the press and at hearings before the Commission and Metro Council. Topgolf USA Louisville, LLC, however, was not formed as an LLC at the time of filing the pre-application and did not legally exist in any form until November 29, 2018, when Topgolf representatives filed it as an assumed name of Topgolf USA KY1, LLC, a Delaware LLC that was registered with the Kentucky Secretary of State on December 19, 2017. Topgolf's counsel stated at the hearing before the Court on May 23, 2019 that "Topgolf USA Louisville, LLC" was listed on the pre-application as a result of a miscommunication between him and his client. In any event, the error was repeated in the subsequently filed Change in Zoning Application, two Conditional Use Permit Applications, several Variance Applications, and two General Waiver Applications. "Topgolf USA Louisville, LLC" was also formally and informally referred to as "the applicant" in documents and materials issued by the Commission and the parties.

In the "Change in Zoning Application" filed on June 7, 2018—a form virtually identical to the pre-application filed the previous February—in addition to Micheli and Topgolf USA Louisville, LLC, on a separate page, also listed under the "Applicant" column in the "Name" blank was "Charles Tapia" with the name "GGP

---

[1] 8750 Central Expressway, Suite 1200, 75231 which is Topgolf USA's corporate headquarters.

Inc." listed below as the "Company," with an address in Chicago, Illinois. GGP, Inc., however, was not registered as a corporation at all relevant times. Its counsel stated in answer to the complaint and at oral arguments that GGP, Inc. was once the name of a Delaware entity known as New GGP, Inc., and as of August 27, 2018, became known as Brookfield Property REIT Inc.; counsel also claimed that at all relevant times Brookfield Property REIT Inc. "indirectly owned" an entity that owns Oxmoor Center, Hocker Oxmoor, LLC. Along with Topgolf USA Louisville, LLC, GGP Inc. remained listed beneath Tapia's name on all applications that followed the pre-application.

While pre-application staff within the Louisville Metro Division of Planning and Design Services requested more information and studies, it preliminarily approved of locating Topgolf at the Oxmoor site to the extent it is "of a moderate to high intensity consistent with the high intensity uses found in the Regional Center Form District as the C-2 zoning district allows for a wide range of regional goods and services . . ." On March 12, 2018, Topgolf representatives met with nearby property owners to listen to their concerns regarding the development. As a result of the hearing, Topgolf decided to move its proposed facility 200 feet farther away from the City of Hurstbourne and also set about performing studies to determine the impact of the development on the light, sound and traffic environment in the area.

Pharis Engineering conducted a lighting study that concluded that Topgolf's partially shielded LED light fixtures would result in "zero light trespass past the property" and "give less light output and less glare" than the existing parking light fixtures at the site. According to Pharis' report, the site fixtures accomplish this because they "have tightly controlled optical light patterns that are designed to light the field with a high degree of accuracy." HMB Professional Engineers conducted a sound study that concluded that "for most of the time

-4-

analyzed during typical weekend hours the existing [sound] levels combined with the noise generated by Topgolf do not result in even a perceptible change in noise." Diane B. Zimmerman Traffic Engineering, LLC, conducted a traffic study examining the impact of the Topgolf development on the adjacent streets, comparing the trip generation data of Oxmoor Center when the Sears store was open for business. Zimmerman concluded that Topgolf would generate 4.4% less traffic on the typical day and for the year 2020, overall the "delays experienced in the area will increase within acceptable limits, thus no improvements to the roadway system are recommended."

After Topgolf publicized the studies on a website and invited nearby residents to review them, it filed the necessary applications with the Planning Commission to have the site rezoned and have the necessary waivers and variances issued. On August 9, 2018, the Land Development and Transportation Committee of the Planning Commission heard testimony from Topgolf, from Joel Dock of the Metro Office of Planning and Design Services, and from those opposed to the development. Notably, the Committee heard that open property located between Oxmoor and Hurstbourne, currently used as soccer fields, was to be developed in the near future and would act as a buffer between Topgolf and residential properties. Topgolf presented expert testimony and other evidence of the above light, sound, and traffic studies. The plaintiffs neither cross-examined the experts nor presented any expert testimony or evidence to rebut them. Joel Dock testified that Topgolf's application was complete and the matter was ready to be scheduled for a public hearing.

The Planning Commission held the first public hearing on October 1, 2018, at the University of Louisville Shelby Campus, within minutes of the neighborhood of those residents close to the proposed Topgolf development. Before this hearing, Metro

Planning and Design Services released a "Change in Zoning Pre-Application Staff Report" that reiterated its earlier conclusion that Topgolf was suited to the Oxmoor location and, further, that "the proposal does not constitute a non-residential expansion into an existing residential area as the proposal utilizes the land of an existing regional commercial center to allow for the development of additional regional services." The Commission, Topgolf representatives, and 31 citizens presented five hours of testimony at this hearing. Joel Dock, the Case Manager on the project, testified on behalf of the Commission and summarized the findings he and the staff made in the Staff Report. Counsel for Topgolf, Cliff Ashburner, presented a summary in favor of the development and introduced Keith Pharis, who presented testimony regarding the lighting, Mitchell Green, who testified regarding the sound studies, Dianne Zimmerman, who testified regarding her traffic study, Kendall Merrick, the general manager of Oxmoor Center, who testified regarding the positive impact Topgolf will have on the mall specifically and the community generally, and, finally, Tanner Micheli of Topgolf.

The plaintiffs, through counsel Stephen Porter, then cross-examined some of these witnesses. Mr. Porter took issue with Mr. Dock's testimony that there were no residential uses within 500 feet of Topgolf's playing field; this is relevant because Land Development Code ("LDC") 4.1.3.B.6.a.ii prohibits outdoor illumination of "any playing field . . . within 500 feet of any residential use" after 11:00 p.m., and Topgolf's proposed facility will close at 1:00 a.m. One of the supposed "residential uses" Mr. Porter claimed was within the prohibited 500 feet was the driveway of a nursing facility. Mr. Dock rightly responded that a nursing facility is not defined as a residential use under the LDC. *See* LDC 1.2.2, Definitions.[2] The second supposed residential use within

---

[2] "Residential Use" is Uses associated with permanent residential occupancy in the form of a dwelling unit (permanent means for at least 30 days in duration). Specific uses such as bed and

the prohibited distance was the vacant parcel to the east of the development, which is zoned R-6 for multi-family use but is currently used as soccer fields. Mr. Dock conceded that if this parcel is ever developed with a residential use, Topgolf will be non-conforming and will have to close by 11:00 p.m. The third supposed residential use Mr. Porter focused on was what he referred to as the "Oxmoor farm property" and the "Bullitt house property" to the south of the proposed development. Mr. Dock's response was not at all clear on the recording, though it is clear that he referred Mr. Porter to the Staff Report. While the plaintiffs now claim that the Commission and its staff "completely disregarded . . . [t]his situation," a map in the record shows that the staff performed several measurements of 500 feet from different points of the proposed development. Assuming the outer edge of where Topgolf's "Southwest building" will be located can be construed as a "playing field" within the meaning of LDC 4.1.3.B.6.a.ii, the measurement indicates that this point is almost exactly 500 feet from the extreme southwestern boundary of what Mr. Porter referred to as "the Bullitt house property." Another measurement from the "southeast pole" of the playing field extends about 100-125 feet into the middle of a large field of what Mr. Porter referred to as the "Oxmoor Farm property." Later in the evening, during Mr. Porter's presentation he showed an aerial photograph with an overlay of the proposed facility and, again, claimed the development was within 500 feet of residential uses on the two Oxmoor properties. The aerial photo shows that the large field on the farm property is either cultivated or plowed for cultivation, and there are structures to the southeast that appear to be barns or other types of utility buildings but are perhaps residential; Mr. Porter presented no evidence on the nature of the structures or any evidence regarding their distances from the proposed development.

---

breakfasts, boarding and lodging houses, hotels, motels and *extended stay facilities* where stays can be less than 30 days in duration shall be considered commercial uses." (Emphasis added)."

Whatever these structures are, they are clearly farther away from the proposed playing field than 500 feet. The dwelling situated on the parcel that Mr. Porter referred to as the "Bullitt house property" is not visible on the aerial photo and is undoubtedly substantially more than 500 feet away from the proposed playing field.

Mr. Porter also cross-examined Mr. Pharis on the lighting issues. After Mr. Pharis confirmed his opinion that the 16 [x] 58,000 lumen field lights would not violate the LDC because they are highly directional, he admitted that he had never been to a Topgolf facility to view the lights firsthand. Mr. Pharis nonetheless stood by his opinion. Mr. Porter then gave a power point presentation that included nighttime photographs of Topgolf facilities that he took in Huntsville, Alabama; Chesterfield, Missouri; Dallas, Texas; and Orlando, Florida. According to Mr. Porter, these photographs prove that light from the proposed development will trespass beyond the playing field and onto neighboring residences. After Mr. Porter finished his presentation, eight citizens testified in opposition to the development before Commission Chair Vince Jarboe continued the hearing to October 15, 2018.

Before the second hearing occurred, Topgolf filed an application for a waiver from LDC 4.1.3.B.2.c, saying it was impossible for an outdoor athletic facility to comply with the Code's requirement that outdoor lighting that emits more than 3,500 lumens be fully shielded, meaning the luminaire must be pointed downward and have a flat, horizontal lens/diffuser. Joel Dock of the Metro Office of Planning and Design Services consulted with an independent lighting expert, Jennifer A. Brons, a professional consultant and adjunct professor at the Lighting Research Center of Rensselaer Polytechnic Institute in Troy, New York. After Dock described the LDC shielding requirements to Brons in an email, she confirmed that "it doesn't seem practical for outdoor athletic complexes to be lit with fully shielded lights."

Brons stated that Dock "may need" to hire a local light designer to determine the extent to which the proposed lighting system would become "a nuisance" and to review and evaluate Pharis Engineering's report. While Topgolf continued to stand behind the conclusion in Pharis' lighting study that none of its lighting will pollute residential properties and will present less glare than what existed when the Sears store was in operation, Topgolf agreed to add a landscape buffer consisting of three tree lines between the City of Hurstbourne and Topgolf that will ultimately grow to a height of 60 feet.

At the second hearing on October 15, Dock testified to his consultation with Brons and presented his amended staff report approving the lighting waiver application. He testified that all evidence indicated that the lights would be aimed and focused on the field and that light trespass and glare will be highly controlled. Topgolf's lighting expert, Pharis, testified that the *existing* parking lot lighting at Oxmoor, on the southeast side nearest residences, consisted of non-shielded, non-glare-controlled lights mounted on 50 feet-high poles that emit 240,000-300,000 lumens each, for a total of 3,675,000 lumens. In contrast, he said, the lighting on the Topgolf site will be shielded, highly directional and will emit only 2,544,000 lumens. Pharis explained the science and math behind his lighting calculations and stated conclusively that there would be no light trespass from the proposed complex onto the property of any residence. Nick Page, a representative of Qualite Sports Lighting, the manufacturer of the field lights at Topgolf Facilities—called the Gamechanger LED Luminaries—also testified. He stressed that the lights facing the residential neighborhoods were highly directional and the beams' focus will be aimed in a gradually slanted downward pattern, below the sight line so as not to trespass on the residential properties in Hurstbourne. Tanner Micheli, a representative of Topgolf, Kendall Merrick, General Manager of Oxmoor Center, and several community members all testified in support of the

Topgolf development. Plaintiffs' counsel cross-examined the lighting experts, and other community members spoke up against the project.

On October 18, 2018, the Planning Commission conducted a third and final meeting and after reviewing the record, with one member not present the Commission issued thirty pages of detailed findings that, in summary, concluded that Oxmoor Center was the best location for the Topgolf development, that the development would benefit the region economically, that it is appropriate in light of Oxmoor's designation as the Regional Center Form District and that the development would not adversely affect the nearby neighborhoods from the perspectives of sound, lighting and traffic. Some of the more relevant findings are as follows:

- [T]he proposal meets the intent of Guideline 1: Community Form because the proposal is of moderate to high intensity consistent with the high density uses found in Regional Center Form District as the C-2 zoning district allows for a wide range of regional goods and services that are not available in lower intensity which offer neighborhood goods and services.

- The proposal contributes to the identity of the regional center as a focal point for transit from homes and workplaces as the proposed C-2 district allows by way of conditional use permit for the incorporation of a regional attraction and destination point for entertainment in an area of current vacancy.

- The Traffic Impact Study made no recommendation for further improvements to the existing vehicular network serving the site.

-10-

- [T]he proposal meets the intent of Guideline 2:  Centers because the proposal will not create a new center.

- Residential development is not currently proposed on the subject site, but adjacent sites are zoned appropriately for a high density development.

- [T]he proposal meets the intents of Guideline 3:  Compatibility because the proposed building materials are consistent with materials found on current retail and entertainment development in the general vicinity and throughout Louisville Metro.

- The netting and poles of the driving range are necessary to maintain public safety.

- There will be a manageable impact to the existing highway network, with Levels of Service remaining in acceptable limits.

- The proposal mitigates adverse impacts of its lighting on nearby properties and on the night sky as the proposed user is a recreational use and lighting is provided and necessary to light the outfield of the golf driving range in the evening.

- Since the original design for the property was made public, the applicant has made a number of refinements to the design to address neighborhood concerns about noise, traffic and lighting.  The three-story structure and driving range outfield have been moved 200 feet to the west and closer to Interstate 264 to reduce noise and lighting impacts and reduce traffic flow.  The nearest residential uses will now be more than a

-11-

quarter of a mile away from the proposed redevelopment. More than ninety percent of the nearby City of Hurstbourne homes will be a half mile or farther from the subject property. The applicant has proposed to install LED lighting below the roof line of the building to reduce light impacts. The applicant has also agreed to paint the net poles around the driving range to better blend with the surroundings and reduce visual impacts.

- The lighting study demonstrates that the proposed redevelopment will both comply with the LDC's requirement regarding light trespass and improve over the existing situation.

- Waiver of LDC, section 4.1.3 to not provide fully shielded lighting for golf driving range . . . will not adversely affect adjacent property owners as the lighting report indicates that the proposed lighting fixtures are aimed and focused on the outfield of the golf driving range for the purpose of lighting the field and light trespass and glare beyond the field perimeter will be highly controlled and minimized. There are no residential uses or other sensitive uses such as churches or schools within 500' and the nearest residential dwelling is over 1200' from the proposed fixtures.

- The lighting report indicates that the field lighting will have virtually no light trespass beyond the field perimeter and the golf driving range is encompassed by a parking lot. The distance from the golf driving range bays housing the proposed fixtures to the pavement of the nearest public road is

roughly 900' and the nearest dwelling unit is over 1200 feet from the fixtures. The lighting plan indicates that the fixtures can be highly controlled and landscaping is proposed at the east end of the field perimeter to further mitigate any potential adverse impacts of glare.

- As shown in the lighting report performed by Keith Pharis, PE, the proposed lighting plan for Topgolf and updated parking lot lighting at Oxmoor Center will produce less up-light, spill-light and glare than the parking lot lighting currently in place at Oxmoor Center.

- In fact, the revised lighting, including Topgolf, will result in a net lumen reduction on the east side of the former Sears building of over 1,100,000 lumens. . . . All in all, the proposed redevelopment will result in a dramatic improvement in lighting conditions.

Based on these and many other findings, the Commission unanimously approved the requested waivers and variances and the requested Revised Detailed District Development Plan and recommended that Metro Council approve the map amendment, the conditional use permit, and the requested variances. The plaintiffs appealed the Commission's actions on November 19, 2018. On November 29, 2019, the Metro Council voted 20-3 to approve the recommendations of the Planning Commission and the plaintiffs also appealed that determination.

(Emphasis original) (citations to record omitted).

-13-

The circuit court, after reciting the applicable standard of review and considering the neighborhood residents' arguments, affirmed the actions of the Planning Commission and Metro Council. On appeal, the residents contend that the applicants were not legally in existence and, thus, could not participate in the litigation; that the factual determinations were arbitrary and capricious; that the actions failed to comply with the relevant requirements of the Comprehensive Plan and the Land Development Code; and that the residents were wrongfully required "to perform the duties of the staff of the Planning Commission."

Our review is guided by the following principles:

> Circuit Court review of the zoning decisions of legislative bodies is specifically authorized by statute at KRS [Kentucky Revised Statute] 100.347. Judicial review of administrative action by such bodies is "concerned with the question of *arbitrariness.*" *American Beauty Homes Corporation v. Louisville and Jefferson County Planning and Zoning Commission*, 379 S.W.2d 450, 456 (Ky. 1964) (emphasis in original). An administrative ruling is arbitrary, and therefore clearly erroneous, if it is not supported by substantial evidence. *Fritz v. Lexington-Fayette Urban County Government*, 986 S.W.2d 456, 458-459 (Ky. App. 1998) (internal citation omitted). Reviewing courts may not disturb factual findings made by an administrative agency if those findings are supported by substantial evidence. In other words, "[a] reviewing court is not free to substitute its judgment for that of an agency on a factual issue unless the agency's decision is arbitrary and capricious." *McManus v. Kentucky Retirement Systems*, 124 S.W.3d 454, 458 (Ky. App. 2003) (internal citation omitted). On determinations of fact "[t]he administrative agency's findings will be upheld even though there exists evidence

to the contrary in the record." *Kentucky Unemployment Insurance Commission v. Landmark Community Newspapers*, 91 S.W.3d 575, 578 (Ky. 2002) (internal citation omitted).

*Danville-Boyle County Planning Comm'n v. Centre Estates*, 190 S.W.3d 354, 359

(Ky. App. 2006).

> [U]nder the *McManus* standard, a court cannot substitute its judgment on those contested issues of fact but if the appealing party has not met his burden of proof with the fact-finder, the court can properly, indeed must, consider whether that party's proof was so compelling that no reasonable person could have failed to be persuaded. If this high standard is met, so is KRS 13B.150(2)(d) which allows for reversal when a final order is "[a]rbitrary, capricious, or characterized by an abuse of discretion."
>
> Simply put, the second part of the *McManus* standard allows for court intervention, reversal, where the evidence favoring the party with the burden of proof is so compelling that the agency's decision is properly seen as arbitrary or capricious or reflecting an abuse of discretion. Stated differently, the *McManus* standard captures how courts properly assess arbitrariness, capriciousness or abuse of discretion by the agency fact-finder in cases where the party with the burden of proof has lost.

*Kentucky Retirement Systems v. Ashcraft*, 559 S.W.3d 812, 820 (Ky. 2018)

(footnote omitted).

The residents argue that the application was illegal *ab initio* because

applicants Topgolf and GGP, Inc., had not registered with the Kentucky Secretary

of State. *See* KRS 14A.9-010(1). Therefore, as so-called non-existent

-15-

corporations, the "entire proceedings" were fraught with "fraud and deceit." Thus, the residents contend, the circuit court improperly affirmed the map amendment, conditional use permit, and variances to Topgolf.

We disagree with the residents that the circuit court acted erroneously. "[T]he purpose of the assumed name statute is to inform members of the public, including appellants, of the identity of persons doing business under an assumed name. It could not be disputed that for lawful use, including litigation, the statute imposes a duty to provide such information." *Munday v. Mayfair Diagnostic Laboratory*, 831 S.W.2d 912, 915 (Ky. 1992). In *Munday*, however, the Court held that "appellees' failure to file the certificate denied appellants information which was essential to the *commencement* of litigation." *Id.* (emphasis added). That is not the argument here, and, even if it were, the residents fell short in their burden of proving that Topgolf and GGP, Inc., actively concealed their true identities to cause the residents to file their appeals out of time. *Cf.*, *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575 (Ky. 2009). In fact, the residents were unaware of the lack of compliance with KRS 14A.9-010(1) and did not argue this issue before the administrative bodies. Accordingly, the circuit court held that the residents forfeited this argument on appeal to the circuit court because it was not a preserved issue. *See City of Louisville v. Kavanaugh*, 495 S.W.2d 502, 505 (Ky. 1973). Topgolf has since cured its defect. GGP, Inc., is now known as Brookfield

-16-

Property REIT, Inc. It, too, had complied with the statute prior to the circuit court hearing.

We hold that the failure, if any, of Topgolf and GGP, Inc., to register their corporate names with the Secretary of State's office resulted in no harm to the residents, either in fact or in procedure. The nature of the agencies' decisions and the residents' appeals therefrom were not affected in any way by the late compliance with the Business Entity Filing Act. The record reflects that the residents had knowledge of the actual applicants from the outset of this litigation. The residents can demonstrate no prejudice, and we again repeat the circuit court's language, namely:

> Plaintiffs [residents] fail to point to any statute or case that can be reasonably construed as requiring the Court to nullify the proceedings below due to the naming errors in the applications. Even if the Court were to find that the plaintiffs did not waive the objection—a finding that would be clearly erroneous under the abundance of case law to the contrary—a review of the statutory law that governs naming and registration errors mandates a finding that no authority exists to support the plaintiffs' position. Plaintiffs' final fallback argument seems to be that affirming the actions of the Commission and Metro Council will encourage future applicants to falsify their names on applications before the Commission. This public policy argument, however, ignores the safety valve built into every circuit court review of actions that administrative bodies take in Kentucky—i.e., that any administrative action can be reversed when it was affected by "fraud or misconduct." *City of Louisville v. Kavanaugh*, *supra*, 495 S.W.2d at 505. Plaintiffs cannot deny and have not denied that they have had ample

-17-

opportunity to investigate the true identities of the applicants to the Topgolf development, both before and after the applications were approved. As noted, not only have the plaintiffs provided the Court with no evidence that the defendants [applicants] committed fraud or engaged in any misconduct during the application process, but they have provided no evidence that the naming errors affected the proceedings in any manner at all. This being so, the only goal the plaintiffs would achieve in having the Court invalidate the actions of the Commission and Metro Council would be that of unnecessary delay of the Topgolf development, a result that is manifestly unjust.

(Footnote omitted).

We next address the allegations of "arbitrary and capricious conduct" by "the Planning Commission, its staff, and the Metro Council." The residents first take issue with the lighting: they contend that the agencies should have required the proposed light fixtures to be fully shielded to minimize the impact on nearby neighborhoods. Furthermore, the residents aver, the agencies placed undue reliance on the lighting report of Pharis despite his admission that he had not personally viewed any existing Topgolf facilities.

We are limited in our review to whether the administrative ruling is supported by substantial evidence. *Danville-Boyle County Planning Comm'n*, *supra*. We have examined the record in its entirety, including the videotaped testimony of the hearings and hold that the evidence supports the agencies' rulings. Although the residents were able to offer some evidence to contradict the report of

Pharis Engineering, it was not "so compelling that the agency's decision is properly seen as arbitrary or capricious or reflecting an abuse of discretion." *Ashcraft*, 559 S.W.3d at 820. We are thus compelled to affirm that aspect of the circuit court's ruling.

We have similarly examined the record in review of the residents' allegations regarding the traffic study. And, again, we decline to disturb the rulings of the agencies, as affirmed by the circuit court. *Id.*

The residents next claim that the Planning Commission, Metro Council, and circuit court "confused 'residential use' with an actual residential building," thus ignoring the LDC requirement that the light fixtures be located beyond 500 feet of residential uses. The map in the record, as well as the residents' failure to address the distances demonstrated there, speaks for itself. Hence, we affirm the circuit court's rejection of this argument by the residents.

The next assertion of error is that the approvals fail to comply with the Comprehensive Plan and LDC. In support of this argument, the residents merely cite to the video transcript and six pages in the record. We have examined the laundry list of alleged instances of noncompliance and decline to disturb the circuit court's ruling in that regard.

The residents lastly maintain that they are "merely members of the public and nearby neighbors" who suffered injury by the administrative agencies'

-19-

failure to scrutinize the applications, failure to verify and evaluate the reports paid for and submitted by the applicants, and the "final arbitrary and capricious actions" in the agencies' approval of the applications. In this vein, they urge that they were inappropriately required to analyze the applicants' submissions and present their own evidence. The professionals, the residents assert, did nothing more than "collect paper and pass it on."

The question is whether the residents received due process, which they did:

> The fundamental requirement of procedural due process is simply that all affected parties be given "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (internal citation and quotation omitted). Procedural due process in the administrative or legislative setting has widely been understood to encompass "a hearing, the taking and weighing of evidence if such is offered, a finding of fact based upon a consideration of the evidence, the making of an order supported by substantial evidence, and, where the party's constitutional rights are involved, a judicial review of the administrative action." *Morris v. City of Catlettsburg*, 437 S.W.2d 753, 755 (Ky. 1969), *see also Kaelin v. City of Louisville*, 643 S.W.2d 590, 591 (Ky. 1982); *Wyatt v. Transportation Cabinet*, 796 S.W.2d 872, 873-74 (Ky. App. 1990). The "right to an impartial tribunal" is nowhere to be found within this list, and rightfully so, since the right, as it is commonly conceived within the judicial context, cannot be guaranteed (nor need it be) in the administrative or legislative setting.

*Hilltop Basic Resources, Inc. v. County of Boone*, 180 S.W.3d 464, 469 (Ky. 2005).  The residents can point to nothing in the proceedings that indicates otherwise.

Accordingly, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Stephen T. Porter
Louisville, Kentucky

BRIEF FOR APPELLEES TOPGOLF
USA LOUISVILLE, LLC; and
TANNER MICHELI:

Clifford H. Ashburner
Paige N. Johnson
Phillip M. Longmeyer
Louisville, Kentucky

BRIEF FOR APPELLEES TWB
OXMOOR 2, LLC; and WMB 2,
LLC:

Cornelius E. Coryell, II
Louisville, Kentucky

BRIEF FOR APPELLEES CHARLES
TAPIA, HOCKER OXMOOR, LLC;
and GGP, INC.:

Timothy W. Martin
Peter Cummins
Louisville, Kentucky

BRIEF FOR APPELLEES
LOUISVILLE AND METRO
PLANNING COMMISSION; and
THE LEGISLATIVE COUNCIL OF
LOUISVILLE/JEFFERSON
COUNTY METRO GOVERNMENT:

Michael J. O'Connell
Laura M. Ferguson
Louisville, Kentucky