RENDERED: OCTOBER 29, 2015
TO BE PUBLISHED

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

## 2014-SC-000422-WC

SHEILA WOOSLEY KINGERY                  APPELLANT


ON APPEAL FROM COURT OF APPEALS
V.                 NO. 2013-CA-000855-WC
WORKERS' COMPENSATION BOARD NO. 89-WC-43931


SUMITOMO ELECTRIC WIRING; DR. JAMES
TODD DOUGLAS; HONORABLE JANE RICE
WILLIAMS, ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION BOARD             APPELLEES


## OPINION OF THE COURT BY JUSTICE NOBLE

## <u>AFFIRMING</u>

The Appellant, Sheila Woosley Kingery, was injured in 1989 as a result of her employment with the Appellee, Sumitomo Electric Wiring, and was awarded workers' compensation benefits, including lifetime medical benefits for treatment of the injury. In 2012, Sumitomo challenged the continuing compensability of her treatment, claiming both that currently prescribed drugs were not reasonable and necessary treatments of Kingery's present complaints and also that such complaints were not causally related to the 1989 work injury. The Administrative Law Judge found that the treatment was compensable. The Workers' Compensation Board affirmed, but the Court of Appeals reversed. On appeal to this Court, we affirm the Court of Appeals.

# I. Background

In the fall of 1989, Sheila Woosley Kingery developed a repetitive-use injury during her employment with Sumitomo Electric Wiring. Kingery testified that her job there required her to reach overhead to hang coils of wire on pegs. She hung about three coils per minute. She testified that she had to strain to loop the coils around the pegs because of her height (she is four feet, eight inches tall). She had worked for Sumitomo for about one month when she developed pain in her neck and upper back.

After she filed a workers' compensation claim, ALJ Dwight T. Lovan awarded benefits, including future medical benefits, for "a cervical and thoracic spine strain or sprain superimposed upon pre-existing degenerative changes." ALJ Lovan further found that the occupational impact of Kingery's injury was minimal and that the effects of the injury did not prevent her from returning to her work activities with Sumitomo, "with the possible exception of the one job she did hanging subassemblies" as that activity had led to the work injury.

Thereafter, Kingery returned to work for Sumitomo and was assigned to a seated position inspecting wire connectors. But, she testified, because this still involved "moving back and forth a lot" while her neck and back were "messed up," she only did this for about two hours before she stopped working for Sumitomo altogether. She testified that she subsequently had one other job with another employer involving counting and packaging items into boxes, which she quit after only a few months because she "couldn't do it either." She has not worked since.

2

On February 15, 2012, Sumitomo filed this medical-fee dispute to contest the reasonableness and necessity of the treatment being provided by Kingery's treating physician, Dr. Todd Douglas, as well as the relatedness of that treatment to the 1989 work injury. Specifically, Sumitomo contested the compensability of Kingery's use of Lorcet,[1] Skelaxin,[2] Xanax,[3] and Celexa,[4] which Dr. Douglas was prescribing at the time of filing of this medical dispute. But after this dispute was filed, Dr. Douglas stopped treating Kingery for the alleged effects of her work injury (while continuing to provide treatment for her other unrelated medical concerns).[5] The parties and the ALJ, however, agreed to proceed with resolving the dispute as filed as if the medications at issue were still being prescribed by Dr. Douglas. Sumitomo also agreed to assist Kingery in finding a new physician to take over her treatment.

In support of its medical dispute, Sumitomo filed the evaluation report of Dr. David Randolph,[6] who evaluated Kingery at Sumitomo's request on

---

[1] Lorcet 10/650 is a combination medication containing the narcotic pain reliever hydrocodone and the non-narcotic pain reliever acetaminophen.

[2] Skelaxin is the trade name for the generic drug metaxalone and is used to treat muscle spasms.

[3] Xanax is the trade name for the generic drug alprazolam, which is a benzodiazepine commonly used to treat anxiety and panic disorders.

[4] Celexa is the trade name for the generic drug citalopram, which is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs).

[5] Indeed, in his final visit note regarding the treatment at issue, Dr. Douglas documented that he had "recommended that [Kingery] consider getting another opinion from a specialist, as she may lose her Worker's Comp coverage soon," and that such a specialist "[m]ay be able to help better with her pain."

[6] Dr. Randolph is board-certified in occupational medicine. At the time of his deposition, he testified that he was also close to obtaining his PhD in epidemiology and biostatistics.

3

December 29, 2011. He also testified via deposition on August 27, 2012. Based on the history Kingery provided, his review of the available medical records, and his own physical examination of Kingery, Dr. Randolph concluded that her current subjective complaints of pain are unrelated to the mild sprain or strain injury caused by her work for Sumitomo in 1989 and that the drugs being prescribed are not reasonable and necessary to treat those complaints, whatever their cause.

Aside from Dr. Randolph's report and deposition, the post-award medical evidence in this case is quite sparse. The record contains two treatment notes from Dr. Douglas, dated February 1 and February 29, 2012, which were her final two visits with him related to the work injury. Dr. Randolph also reviewed and summarized in his report more than 50 medical records documenting Kingery's treatment with Dr. Douglas from 1999 through 2011. According to those notes, Dr. Douglas's treatment had been directed, in relevant part, toward Kingery's complaints of pain—in her low, middle, and upper back, and neck—as well as stress, anxiety, and depression. This treatment exclusively involved prescribing various narcotics and other drugs. No objective abnormalities are noted.

Kingery filed no medical evidence to rebut Dr. Randolph's opinions. Instead, she testified about her original work injury, work history, medical history, and current medical condition. As noted above, she testified that she has been unable to work over the past two decades due to her medical condition. She testified that pain in her neck and upper back has persisted and worsened since her 1989 work injury and that it now involves everything from

4

her low back, to her mid-back and ribs, and up to her neck. She confirmed that she has never had surgery for her complaints and that surgery has never been recommended. She testified that her low-back pain first began as a result of a fall in 2011, and she disputed the accuracy of Dr. Douglas's treatment notes prior to 2011 referencing low-back pain as her primary complaint. She testified that the drugs prescribed by Dr. Douglas would dull the pain, but that it never completely went away.

Despite the absence of any medical evidence to the contrary, the ALJ disregarded Dr. Randolph's opinions and instead relied solely on Kingery's lay testimony to find that her current complaints were related to the 1989 work injury and that the drugs being prescribed for those complaints were reasonable and necessary. Sumitomo filed a petition for reconsideration, arguing that it was inappropriate for the ALJ to disregard the only expert medical evidence in the record—the report and testimony of Dr. Randolph—in favor of Kingery's lay testimony. The ALJ overruled the petition, and the Board affirmed.

Sumitomo appealed to the Court of Appeals, which reversed, holding that Kingery had failed to produce medical evidence to sustain her burden of proving that the treatment by Dr. Douglas was causally related to her 1989 work injury or a condition caused by it. More specifically, the Court of Appeals concluded that, under the circumstances, the medical cause of Kingery's complaints of pain would not be apparent to a lay person and, thus, that it was impermissible for the ALJ to disregard the medical evidence in favor of

5

Kingery's lay testimony to find that her current condition and complaints of pain were medically caused by the 1989 work injury.

Kingery now appeals that decision as a matter of right. Additional facts will be developed as necessary in the discussion below.

## II. Analysis

Kingery argues that the Court of Appeals was incorrect in concluding that she had the burden of proving that her current complaints were causally related to the 1989 work injury, and that there was substantial evidence to support the ALJ's finding that her current complaints are causally related to her work injury. However, this Court affirms the Court of Appeals because we believe that the evidence compelled a finding in favor of Sumitomo on the compensability of the disputed treatment, whether or not it had the burden of proof on that issue. Thus, we do not reach the question whether Kingery or Sumitomo had the burden of proof on causation.

It is well-settled that the ALJ, as fact-finder, has the "sole authority to determine the quality, character, and substance of the evidence." *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993). And "[w]here ... the medical evidence is conflicting, the question of which evidence to believe is the exclusive province of the ALJ." *Id.* The problem here, though, is that there *was no* conflicting medical evidence in the record. Rather, the only medical evidence that was before the ALJ supported Sumitomo's position on the primary issue of medical causation of Kingery's current complaints. The ALJ, however, chose to disbelieve the uncontroverted medical evidence to find in favor of Kingery.

6

But, as the Court of Appeals noted, ALJs are not permitted to rely on lay testimony, personal experience, and inference to make findings that directly conflict with the medical evidence, except in limited situations, such as matters involving observable causation. *Mengel v. Hawaiian-Tropic Northwest and Central Distributors, Inc.*, 618 S.W.2d 184, 187 (Ky. App. 1981). In other words, "when the question is one properly within the province of medical experts, the [ALJ] is not justified in disregarding the medical evidence." *Id.*

First, none of the decision-makers below analyzed the compensability of the Xanax and Celexa separately from that of the Lorcet and Skelaxin, although Dr. Randolph did so in his report and deposition testimony. These two pairs of drugs present distinct issues because the latter treat physical ailments (which are what Kingery's original work injury involved) while the former treat psychological concerns (which her work injury did not involve).

After scrutinizing the record for substantial evidence relating Kingery's use of Xanax and Celexa to the 1989 work injury, it is apparent that there is none. Dr. Douglas, her former treating physician, stated in his most recent treatment note that Kingery was taking those drugs because she was "[n]ot … able to work, and decreased income causes her a lot of stress."

But her present inability to work cannot be related to her 1989 work injury because, as ALJ Lovan found in the original opinion and award, the work-related injury did not prevent her from returning to her employment with Sumitomo (or any other employment for that matter). Any present stress or anxiety she might experience as a result of not working, then, is necessarily unrelated to her work injury. Indeed, the original opinion and award includes

7

an express finding that any alleged psychological concerns were not the result of the work injury. Any medical expenses related to relieving such symptoms are thus non-compensable. Accordingly, Sumitomo cannot be obligated to pay for Kingery's use of Xanax and Celexa.

Next, with respect to the Lorcet and Skelaxin, there can be no doubt that the medical cause of Kingery's subjective complaints of pain for which these drugs were being prescribed (as well as the reasonableness and necessity of those drugs to treat such complaints) is a question properly within the province of medical expert opinion. *Mengel*, 618 S.W.2d at 187. Therefore, the ALJ was not justified in disregarding the medical evidence in favor of Kingery's lay testimony. *Id.*

Kingery's original work-related injury to her neck and upper back occurred in November 1989, more than twenty-one years before Sumitomo filed this medical-fee dispute. By all accounts it was a mild sprain or strain injury that was caused by repetitively reaching overhead to hang coils of wire on pegs for a period of weeks.

In the intervening years, however, she developed a multitude of worsening health concerns—including morbid obesity,[7] insulin-dependent diabetes, high blood pressure, congestive heart failure, chronic obstructive pulmonary disease (COPD) and asthma, manic depression and anxiety with history of suicide attempts, and gastroesophageal reflux disease—requiring

---

[7] At her deposition, Kingery testified she weighed about 270 pounds. According to Dr. Randolph, this gave her a body mass index (BMI) of about 60; and BMIs in excess of 30 are generally considered obese.

extensive clinical interventions and regular pharmacological treatment. Substantial, objective medical evidence demonstrated the existence of these conditions.

On the other hand, there was no objective medical evidence of any physiological condition that can explain Kingery's present complaints of neck and back pain. And Dr. Randolph opined that such "medically unexplained symptoms" most certainly cannot be attributed to the mild, repetitive-use, soft-tissue strain she experienced during her one month of employment with Sumitomo over two decades ago.

Kingery testified that much, if not all, of her ongoing and progressively worsening issues are effectively the result of deconditioning due to her claimed inability to work (or walk, or sit, or stand, for extended periods), which she attributed to her 1989 work injury. Assuming she is correct that her present issues are the result of inactivity and deconditioning, they are necessarily unrelated to her work injury for the same reason that her psychological issues and treatment are non-work-related: because the findings in the original opinion and award were that the injury resulted in only minimal occupational restriction and did not prevent her from working. She never reopened the original award to seek additional impairment for a worsening of her condition, and thus she is bound by the original award's findings. Kingery's failure to work—and the deconditioning that unavoidably accompanied her idleness—cannot be attributed to the 1989 injury. It instead stems from her own choice not to work, despite her having had the ability to do so in 1989, and to remain inactive.

And this is where Dr. Randolph's expert opinion comes into play. According to Dr. Randolph, Kingery's current medically unexplained symptoms—i.e., unverifiable complaints of pain and related magnifications of symptoms, such as universally-restricted range of motion and inconsistent strength-testing results—bear no physiological relationship to the mild workplace strain she experienced in 1989. As Dr. Randolph put it, "there is absolutely nothing [in the mechanism of injury described by Kingery] that would fit the pattern of subjective complaints lasting more than 20 years. ... There is nothing in published medical literature that would indicate an explanation for these subjective complaints lasting for 23 years." Instead, Dr. Randolph opined that the "significant unrelated medical comorbid states," principally her morbid obesity, are the actual source of her ongoing subjective complaints. Given the time frame and extraneous health issues involved, the medical causation of Kingery's current complaints was necessarily within the province of medical expertise. *See Mengel,* 618 S.W.2d at 187.

Additionally, Dr. Randolph's opinions with respect to the reasonableness and necessity of Kingery's use of each of the drugs were also based on sound medical science and reasoning and were well within the sole province of medical expert opinion. He aptly noted the substantial dangers and health risks attendant to use of these drugs, both individually and collectively with the multitude of drugs Kingery was being prescribed for her many other unrelated complaints and clinical conditions. As to the opioid (Lorcet) and muscle relaxant (Skelaxin) in particular, he contrasted the substantial risks the narcotic drugs posed with their lack of long-term efficacy in treating

10

chronic benign pain (a fact that is borne out here by Kingery's persistent, or even worsening, and migrating complaints). And as Dr. Randolph noted, such views are widely accepted in the medical community and supported by a significant body of peer-reviewed medical literature.

Yet, in Kingery's view, all that uncontroverted medical evidence can be tossed aside, without any countervailing evidence supporting the decision to do so, because the ALJ decided to simply disbelieve that proof. The ALJ gave two bases for disbelieving Dr. Randolph's expert medical opinions, neither of which hold up under scrutiny.

First, the ALJ found that Dr. Randolph's testimony lacked credibility and was unreasonable because he recommended "no treatment at all for her work-related condition." This finding is not supported by the record.

Contrary to the ALJ's finding, Dr. Randolph did recommend treatment for Kingery specifically geared toward alleviation of her subjective chronic pain (despite believing that such complaints were not related to the two-decade-old strain injury). In addition to significant intervention for her many unrelated problems, he believed that the best treatment for Kingery would be to stop taking the drugs—drugs that had not only proven ineffective in treating her long-term chronic pain, but were in all likelihood at least partly to blame for the worsening, migrating complaints —and that she commit to a home exercise program directed at the true source of the vast majority of her problems (i.e., her morbid obesity and deconditioning from inactivity). Though this fell short of a recommendation of pharmacological or surgical intervention, it is not a recommendation of no treatment at all.

11

And, rather than casting doubt on the credibility of those recommendations, Kingery's testimony corroborates them. Again, she admitted that her difficulties are ever-present, despite all pharmacological interventions. And, she claims her problems have worsened and migrated all over her torso. Dr. Randolph's recommendations account for these concerns and reflect, in his expert medical opinion, the reality that her drug regimen has not only been unsuccessful in treating her complaints, but is also likely to blame, at least in part, for the progression of her worsening state of health. There is simply no other reasonable medical explanation for why Kingery would still be complaining, after over twenty years, of pain related to a past sprain or strain injury, at least not in the record.

And the second dubious basis provided by the ALJ for rejecting Dr. Randolph's opinions—the doctor's purported "skeptic[ism] that [Kingery's] original injury was related to her work for [Sumitomo]," which was unreasonable because "[t]his issue has long been settled since ALJ Lovan found her injury to be work related in 1992"—is also unsupported in the record. Upon careful review of Dr. Randolph's evaluation report, as well as the transcript of his deposition testimony, it is clear that nowhere in either source of testimony did Dr. Randolph state that he was skeptical that Kingery's work with Sumitomo caused the original work injury. He did state that he believed her present complaints of pain were unrelated to the 1989 injury, but that is a far cry from claiming the original injury was not related to her work for Sumitomo.

12

At most, Dr. Randolph's testimony indicates that he was hesitant to provide a diagnosis for what occurred in November 1989. But that was an entirely reasonable response because, as Dr. Randolph explained, there was a notable absence of contemporaneous medical records documenting the injury at that time. Nonetheless, despite that difficulty, Dr. Randolph concluded: "based on what I found from her and what she told me and what the records showed, realizing that nothing was contemporaneous with that event, I would say that she had some kind of a cervical sprain/strain injury." Far from demonstrating skepticism of the original work injury, Dr. Randolph agreed, albeit cautiously, that Kingery had a neck or upper-back injury in 1989. This was consistent with the work injury originally found by ALJ Lovan.

It is thus clear that the current ALJ rejected the uncontroverted medical opinions, at best, based on a misreading of the record. In any event, the ALJ's findings in this respect were not based on substantial evidence and were insufficient to justify rejection of the medical evidence in this case.

Of course, that is not to say that reasonable medical minds could not disagree with Dr. Randolph's conclusions. After all, the human body is perhaps the most complex system known to humankind, so very little will ever garner unanimous consensus among medical professionals and experts. But this is exactly why our legal system requires reliable expert proof on issues such as medical causation and the necessity of medical treatment when they would not be apparent to a layperson. It does so because this is the only way to reasonably ensure that the fact-finder answers those questions reasonably, rather than arbitrarily.

13

Such questions are solely within the province of medical experts who are equipped with the proper education and experience to enable them to provide reliable answers within a reasonable degree of medical probability. We cannot accept ignoring uncontroverted medical evidence in favor of unreliable lay testimony and the ALJs' own proclivities and experience when determining such medical issues. That is not substantial evidence.

And it would not have required much medical evidence to support the ALJ's decision to disregard Dr. Randolph's opinions here. Some contrary report from Kingery's treating physician, for example, likely would have sufficed.

But that is not what occurred here. Indeed, nearly the opposite happened: Dr. Douglas proactively declined to continue treating Kingery for her alleged work-related complaints when he became aware that the compensability of the treatment he was providing for those complaints was being questioned (while continuing to see her for her other, unrelated medical problems). Even Kingery's treating physician was unwilling to opine that the drugs he was prescribing were reasonable and necessary to treat her complaints resulting from the 1989 work injury.

In the end, our rationale is slightly different than that of the Court of Appeals, but of course "an appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009). Whether or not the employer had the burden of proof, under the circumstances of this case, the evidence compels a finding that the treatment at issue is not compensable. *See Wagoner v. Smith*, 530 S.W.2d 368, 369 (Ky. 1975) ("In order to reverse the

14

findings of the board unfavorable to the claimant and upon which he had the burden of proof the test is whether the evidence compelled a finding in his favor."). Upon careful review of the entire record, it is clear that the ALJ's decision to wholly reject the uncontroverted medical evidence introduced by Sumitomo in favor of Kingery's lay testimony, and thereby find that Kingery's use of Xanax, Celexa, Lorcet, and Skelaxin is reasonable and necessary and related to the 1989 work injury, was not based on substantial evidence.

The questions in this medical dispute were undeniably those which should fall within the sole province of expert medical opinion. When all the medical evidence on such a question points to one conclusion, the ALJ acts outside the immense discretion she otherwise typically enjoys when she rejects that evidence in favor of lay testimony to reach a contrary conclusion without sufficient justification for doing so.

### III. Conclusion

For the reasons explained above, this Court finds that the evidence compelled finding the treatment at issue in this medical dispute non-compensable. Accordingly, this Court affirms the Court of Appeals' reversal of the Workers' Compensation Board and Administrative Law Judge.

Abramson, Cunningham and Venters, JJ., concur. Minton, C.J., dissents by separate opinion in which Barber and Keller, JJ., join.

MINTON, C.J., DISSENTING: I respectfully dissent. The majority opinion's analysis exceeds the proper scope of appellate review by engaging in a wide-ranging reweighing of the proof, usurping the role of the ALJ. Our task is simply to "address new or novel questions of statutory construction, or to

15

reconsider precedent when such appears necessary, or to review a question of constitutional magnitude."[8] And this case presents none of those challenges.

Its statements to the contrary notwithstanding, the majority follows the misguided direction taken by the majority of the Court of Appeals panel, which—as the dissenting judge on that panel aptly observed—placed the burden of proof on Kingery, despite the fact that Sumitomo was the party seeking to reopen the claim to contest medical bills. On a motion to reopen, "[t]he party responsible for paying post-award medical expenses has the burden of contesting a particular expense by filing a timely motion to reopen and proving it to be non-compensable."[9]

Sumitomo filed its motion to dispute Kingery's medical bills and supported it with a report from Dr. Randolph, who opined that Kingery's current impairments were not related to the original work-related injury. In response, Kingery did not submit medical evidence but testified that she has experienced pain ever since the work-related injury and that Dr. Douglas's treatment had given her some relief.

As the fact-finder, the ALJ had sole authority to determine the weight, credibility, substance, and inferences to be drawn from the evidence.[10] And the ALJ has the discretion to choose from conflicting evidence which evidence she finds more persuasive.

---

[8] *Western Baptist Hospital v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992).

[9] *Crawford & Co. v. Wright*, 284 S.W.3d 136, 140 (Ky. 2009) (citing *Mitee Enterprises v. Yates*, 865 S.W.2d 654 (Ky. 1993) (holding that the burden of contesting a post-award medical expense in a timely manner and proving that it is non-compensable is on the employer).

[10] *Paramount Foods, Inc v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985).

The ALJ disbelieved Dr. Randolph's report, finding it fundamentally flawed because the doctor rejected out of hand the fact that Kingery sustained a work-related injury—a matter that has been the law of this case since 1992. Unlike the lay evidence rejected in *Mengel*[11]—the case cited by the majority—Kingery was capable of rebutting Sumitomo's motion by testifying about the pain she experienced since the work-related injury. And the ALJ did not abuse her discretion in finding Kingery credible.

Because the ALJ rejected the proof offered by Sumitomo and Sumitomo had the burden of showing Kingery's medical treatment was not related to the work-related injury, the ALJ did not err by denying Sumitomo's motion. I would reverse the decision of the Court of Appeals and reinstate the ALJ's decision.

Barber and Keller, JJ., join.

---

[11] *Mengel*, 618 S.W.2d 184.

COUNSEL FOR APPELLANT:

McKinnley Morgan
Morgan Collins & Yeast
921 South Main Street
London, Kentucky 40741


COUNSEL FOR APPELLEE, SUMITOMO ELECTRIC WIRING:

Joel Walter Aubrey
Brian David Wimsatt
Pohl & Aubrey, P.S.C.
303 North Hurstbourne Parkway, Suite 110
Louisville, Kentucky 40222


APPELLEE, DR. JAMES TODD DOUGLAS:

PO Box 1367
Morgantown, Kentucky 42261


APPELLEE, HONORABLE JANE RICE WILLIAMS:

Rice, Hendrickson & Williams
217 S. Main Street, Suite 10
London, Kentucky 40741


APPELLEE, WORKERS' COMPENSATION BOARD:

Dwight Taylor Lovan, Executive Director
Office of Workers' Claims
Prevention Park
657 Chamberlin Avenue
Frankfort, Kentucky 40601


COUNSEL FOR AMICUS CURIAE,
THE KENTUCKY CHAPTER OF AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS:

Eric M. Lamb
Lamb & Lamb, PSC
PO Box 34275
Louisville, Kentucky 40232-4275