RENDERED: MARCH 23, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2022-SC-0119-WC

PERRY COUNTY BOARD OF EDUCATION                      APPELLANT


|  | ON APPEAL FROM COURT OF APPEALS |
| :-- | :--: |
| V. | NO. 2021-CA-0605 |
|  | WORKERS' COMPENSATION BOARD NO. 2018-WC-86442 |


MARK CAMPBELL; HAZARD ARH; DR.                      APPELLEES
MUKUT SHARMA; WORKERS'
COMPENSATION BOARD; AND HON.
GRANT S. ROARK, ADMINISTRATIVE LAW
JUDGE


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Mark Campbell injured his knee while at work in 2018. Campbell received workers' compensation benefits for the injury's treatment. After surgery to correct the injury, Campbell continued to experience knee pain. He ultimately received a total knee replacement, about which his employer, Perry County Board of Education (Perry County School Board), filed a medical fee dispute. An Administrative Law Judge (ALJ) found that the total knee replacement was compensable. The Workers' Compensation Board (the Board) affirmed the ALJ. The Court of Appeals, in turn, affirmed the Board. For the reasons stated below, we affirm the Court of Appeals.

## I.     BACKGROUND

On April 11, 2018, while working for Perry County Schools, Mark Campbell was in the gymnasium of Perry County High School to hang a banner when he hit his head on a duct and fell. The fall injured his head, shoulder,[1] and knee. He first saw the school nurse, then went to a hospital for assessment and treatment that same day. There, medical staff closed the open wound on his head. They also performed preliminary scans on his shoulder and knee. The radiology report from that hospital visit indicated that Campbell's knee had mild changes from arthritis, as well as a possible fracture. At a follow-up appointment just over a month later, on May 30, 2018, another radiology report indicated a softening of the cartilage of the patella and a partial dislocation of the patella. It also indicated that Campbell's patellar tendon was strained or torn.

Campbell's primary care physician referred him to Dr. Mukut Sharma. Following his injury, Campbell tried non-surgical treatment under Dr. Sharma's direction to resolve his knee pain. When that was unsuccessful, Dr. Sharma referred Campbell to Dr. Darren Johnson for a right knee arthroscopy with partial meniscectomy. At Campbell's pre-operation appointment with Dr. Johnson on October 22, 2018, an x-ray demonstrated a small amount of early

---

[1] Campbell's head and shoulder injuries are not at issue in this case. His shoulder ultimately required surgery to fix his injuries, and many of his medical reports include notes regarding the status of his shoulder in addition to their comments regarding his knee injury. We discuss only the notes relevant to Campbell's knee.

osteoarthritis in the knee, mild patellofemoral narrowing, and an osseous fragment inferior to the patella. These are typical of osteoarthritis, which is a degenerative disease occurring when the cartilage within a joint breaks down over time.[2] On November 6, Dr. Johnson performed surgery. He stated that the surgery was successful, and that Campbell could return to work without restrictions by December 17, 2018.

Despite Dr. Johnson's statement, Campbell's pain persisted. Dr. Sharma noted this continued pain and directed Campbell to receive additional conservative treatment, including corticosteroid injections, physical therapy, and at-home exercises to treat his pain. On March 21, 2019, four months after his surgery, Dr. Sharma indicated that Campbell still had localized swelling around his knee, pain throughout range of motion, and clicking in the knee joint indicative of a meniscal injury. Dr. Sharma diagnosed an acute meniscal tear, contusion, knee sprain, osteoarthritis, and internal derangement of medial meniscus. An x-ray indicated again that Campbell's joint was narrowing at his knee. Dr. Sharma prescribed continued physical therapy, an anti-inflammatory medication, and home exercises. However, he also noted that Campbell's physical therapy, medicine, and injections had been ineffective on his knee (despite being effective for his shoulder recovery).

Six months later, on September 16, 2019, Dr. Sharma again recorded that Campbell suffered from an acute meniscus tear, a contusion, a knee

---

[2] *Osteoarthritis (OA)*, CENTERS FOR DISEASE CONTROL & PREVENTION (July 27, 2020), www.cdc.gov/arthritis/basics/osteoarthritis.htm.

sprain, and osteoarthritis in the knee. He noted that Campbell's right knee was still in pain and only getting worse, even after his arthroscopy surgery with Dr. Johnson and subsequent treatment. In his notes, Dr. Sharma wrote that Campbell's knee pain was caused by the April 11, 2018 incident. Campbell would later testify that at this appointment, he and Dr. Sharma discussed his options for treatment. Dr. Sharma and Campbell ultimately determined that a total knee replacement would be the best treatment for Campbell given the ineffectiveness of prior treatment to relieve his pain. Soon after this appointment, Dr. Sharma requested approval for the total knee replacement surgery from Campbell's workers' compensation benefits provider, which had covered his medical fees up to that point.

To determine whether the knee replacement was necessary, the Bluegrass Health Network (the group managing Campbell's workers' compensation benefits) sought the opinion of Dr. David Muffly, an orthopedic surgeon. Dr. Muffly met with Campbell for an assessment. Additionally, he did a full review of Campbell's medical history. Dr. Muffly's report is thorough and complete. Amongst other things, Dr. Muffly noted that Campbell had a right knee medial meniscus tear related to his April 11, 2018 work injury, and that the same knee had osteoarthritis with chronic complaints of right knee pain. He also noted that Campbell had no pre-existing active impairment, despite identifying Campbell's osteoarthritis. Dr. Muffly concluded that Campbell did not need a knee replacement at that time. Instead, Dr. Muffly recommended

"self-directed exercise and non-prescription medications." In a follow-up email, Dr. Muffly reiterated this conclusion, stating,

> Mark Campbell does not need a right knee replacement because x-rays made on 10-8-2019 show early arthritis that can be adequately treated without knee replacement. It is not reasonable or necessary that knee replacement be done for the work injury on 4-11-2018. Treatment for the right knee would include self-directed exercise, non-prescription medications and weight loss.

Following Dr. Muffly's report, Dr. Kirsch of Bluegrass Health Network issued a utilization review notice of denial. Campbell's request was officially denied on November 15, 2019. In that denial, Dr. Kirsch wrote,

> [Campbell] had degenerative changes in the right knee noted at surgery which were in my opinion existing and not due to the 04/11/18 events based on the information in the chart. I do not support the request as necessary for the 04/11/18 event and I agree with Dr. Muffly's [opinion].

Following the denial, Dr. Sharma met again with Campbell. At this appointment, Dr. Sharma made note of several of Campbell's right knee symptoms, including the following: kneecap feels out of place; kneecap is swollen; leg suddenly "locked up" at the knee; knee catches when walking; inability to sleep due to pain; clicking/grating sensation in the knee; knee buckles suddenly; and knee pain is not improved by medication, stretches, rest, heat, ice, walking aids, braces, or physical therapy. Another x-ray indicated narrowing of knee joint space, this time described as "bone on bone." Dr. Sharma noted again Campbell's prior ineffective treatments. He also noted explicitly that Campbell "had no problem [with right] knee pain prior to work related injury." Dr. Sharma indicated in Campbell's treatment plan that Dr. Sharma would perform total knee replacement on December 4, 2019.

5

Dr. Sharma ultimately did perform Campbell's total knee replacement. Campbell again sought approval for workers' compensation benefits to cover the surgery. His employer, Perry County School Board, filed a Form 112 medical fee dispute regarding the surgery. Perry County School Board contested the causation of the injury, as well as the reasonableness and necessity of the total knee replacement. In support of their position, the Perry County School Board requested an Independent Medical Examination from Dr. David Jenkinson. Dr. Jenkinson met with Campbell and reviewed his medical records, as well as the report from Dr. Muffly. Dr. Jenkinson agreed with Dr. Muffly regarding the lack of necessity or reasonableness for the total knee replacement. Dr. Jenkinson reported that Campbell's knee was allegedly worse after his meniscal repair, that he had shooting pain, and a slow recovery after his knee replacement. Dr. Jenkinson also reported that Campbell averred he felt better after the knee replacement than he had before it.

Although no one had previously disputed the legitimacy and work-relatedness of Campbell's original injury necessitating his first meniscal surgery, Dr. Jenkinson stated in his report that "[t]here is no evidence that [Campbell] had a significant acute injury to his right knee on 4/11/2018." Instead, Dr. Jenkinson believed the complete cause of all of Campbell's "abnormalities" was "pre-existing degenerative change." Despite this assessment, Dr. Jenkinson agreed with Drs. Johnson and Muffly that Campbell reached Maximum Medical Improvement (MMI) on December 17, 2018, following his meniscus repair.

Campbell, in response, provided an IME from Dr. Jared Madden, dated June 3, 2020. Dr. Madden diagnosed Campbell with "Right Knee Meniscal Tears/Osteoarthritis, S/P Surgical Repair with Right TKA[,] Chronic Right Knee Pain" and "Degenerative Joint Disease," amongst other things. On the following question, which asked, "Within reasonable medical probability, was plaintiff's injury the cause of his/her complaints?", Dr. Madden checked "yes." This alone is unequivocal evidence from Dr. Madden that Campbell's current knee pain was caused by his workplace injury. In the explanation section for causation, he wrote,

> Mr. Campbell suffered an injury to the right shoulder and knee during the course of a normal workday. His injuries required surgical repair. Though successful, scar tissue is never as strong as original tissue and as such the patient will always be at an increased risk for future reinjury . . . . Though Mr. Campbell has received treatment from an orthopedic specialist, his right knee injuries have not completely resolved and continue to progressively worsen. He continues to suffer from pain, swelling, and instability of the right knee. . . . Failure to provide additional treatment as recommended could expose the patient to unnecessary degenerative changes within the joints of the lower extremity and the exacerbation or worsening of other problems. In other words, without appropriate management, the problem will significantly and rapidly worsen resulting in advanced degenerative changes and increasing pain.

Dr. Madden's report can be read to suggest that the total knee surgery was inevitable and therefore compensable. By contrast, as noted above, the other three doctors (Drs. Muffly, Kirsch, and Jenkinson) who reviewed Campbell's case opined that a total knee replacement would neither be necessary nor reasonable due to Campbell's workplace injury.

Campbell and the Perry County School Board appeared before an ALJ to resolve the dispute over medical fees. After a full hearing, the ALJ determined that Campbell was entitled to workers' compensation benefits for the total knee replacement. The ALJ relied on Dr. Madden's findings to reach his conclusion, about which he wrote,

> . . . Dr. Madden . . . concluded the right total knee replacement surgery would be causally related to the April 11, 2018 incident and that plaintiff continued to have right knee pain even after Dr. Johnson's meniscectomy and that he had right knee osteoarthritis which was not remedied by Dr. Johnson's surgery.

> Having reviewed the evidence of record, the ALJ notes this is not the kind of case where a claimant with a knee injury undergoes a successful meniscal repair surgery and several years later, after virtually complete recovery, requires a total knee replacement surgery for osteoarthritis which he then tries to relate back to the original meniscal repair surgery. In the present case, the ALJ is persuaded from the fact that plaintiff's April 11, 2018 work injury caused the meniscal damage which Dr. Johnson repaired, but that it also made plaintiff's underlying right knee osteoarthritis symptomatic, [and] this condition was never remedied by Dr. Johnson's surgery. Support for this conclusion comes from the fact that plaintiff credibly testified he continued to have right knee pain even after Dr. Johnson's surgery and the fact that he was referred to Dr. Sharma for treatment within just a few months of being released by Dr. Johnson.

Following Perry County School Board's Petition for Reconsideration, the ALJ provided additional findings. The ALJ addressed Perry County School Board's argument that Dr. Madden never specifically stated that the total knee replacement was necessitated by the April 11, 2018 accident. In so doing, he stated that although Dr. Madden "did not explicitly say plaintiff's osteoarthritis or need for total knee replacement surgery were causally related to plaintiff's April 11, 2018" work injury, his diagnoses included the total knee replacement

8

surgery and chronic knee pain, and he indicated that the issues he diagnosed were work-related. The ALJ also gave weight to the "temporal relationship" between the two surgeries and the injury, as well as to Dr. Madden's and Campbell's assertions regarding Campbell's continued pain despite earlier treatment.

The Perry County School Board appealed the ALJ's decision to the Workers' Compensation Board. To the Board, the Perry County School Board argued that the ALJ improperly relied on inferences to reach his conclusions on causation, and that even if the further injury had been caused by Campbell's initial work injury, the total knee replacement was neither reasonable nor necessary as treatment.

The Board was unpersuaded by the Perry County School Board's arguments. The unanimous Board affirmed the ALJ, concluding that there was substantial evidence to support his conclusions and that his inferences were proper. The Perry County School Board appealed the Board's decision to the Court of Appeals, which affirmed the Board. The Perry County School Board now appeals to this Court.

## II.    ANALYSIS

To this Court, Perry County School Board makes two arguments for reversal. First, it argues that the ALJ improperly relied upon inferences instead of medical opinion evidence in reaching his conclusions on causation. Second, it argues that the ALJ similarly erred by relying on inferences instead of

9

medical opinion evidence to determine that the total knee replacement was reasonable and necessary. We address each argument in turn.

Our standard of review in workers' compensation cases is well-settled. Regarding questions of fact, "[t]he ALJ as fact finder has the sole authority to judge the weight, credibility, substance, *and inferences* to be drawn from the evidence." *Ford Motor Co. v. Jobe*, 544 S.W.3d 628, 631 (Ky. 2018) (citations omitted) (emphasis added). The ALJ may reject any testimony and believe or disbelieve various parts of the evidence regardless of whether it comes from the same witness or the same party's total proof. *Khani v. Alliance Chiropractic*, 456 S.W.3d 802, 806 (Ky. 2015) (citations omitted). In front of the ALJ, Campbell bore the burden of proving that he was entitled to the reimbursement of his medical fees. KRS 342.735(3). Campbell was successful. Thus, if the ALJ's conclusions are supported by substantial evidence, he must be affirmed. *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986).

Before an in-depth review, we must determine the true controversy at the heart of this case. In his conclusion, the ALJ wrote that the April 11, 2018 injury "made plaintiff's underlying right knee osteoarthritis symptomatic." In essence, the ALJ described a workplace injury that brought a dormant preexisting condition into disabling reality. Such injuries are compensable if they satisfy *Finley v. DBM Technologies*, 217 S.W.3d 261 (Ky. App. 2007). Although the ALJ did not make findings specifically with reference to *Finley*'s requirements, his findings allow us to determine on review if the requirements

were nonetheless satisfied. Accordingly, we review the Perry County School Board's arguments within a reframing of the case under *Finley*.

*A. Dormant Condition Aroused into Disabling Reality*

Under *Finley*, "[A] pre-existing condition that is both asymptomatic and produces no impairment prior to the work-related injury constitutes a pre-existing dormant condition. When a pre-existing dormant condition is aroused into disabling reality by a work-related injury, any impairment or medical expense related solely to the pre-existing condition is compensable." *Id.* at 265.[3] In short, for Campbell's medical expenses related to his osteoarthritis to be compensable, his condition must have been asymptomatic and producing no impairment prior to his April 11, 2018 injury.

In *Finley*, an injured worker suffering from scoliosis sought workers' compensation benefits after her condition became symptomatic. *Id.* at 263. Before her workplace injury, the worker had never been treated for her scoliosis. *Id.* Because her scoliosis was only symptomatic after her workplace injury (and was not impairment ratable prior to the injury), the treatment for her condition was held compensable. *Id.* at 266. Thus,

> where the underlying pre-existing disease or condition is shown to have been asymptomatic immediately prior to the work-related traumatic event *and* all of the employee's permanent impairment is medically determined to have arisen after that event . . . then as a

---

[3] *Finley* also, in most cases, requires findings regarding whether the condition was temporarily or permanently aroused. *Id.* at 266 ("[T]he ALJ erroneously failed to make an essential finding of fact upon whether Finley's pre-existing dormant scoliosis was temporarily or permanently aroused by the work-related back injury. As a reviewing body, neither we nor the Board should attempt to supplant such a finding of fact.") (citations omitted). However, because this case comes to us on review of a medical fee dispute, the issue of the disability's permanency is irrelevant.

> matter of law the underlying condition must be viewed as previously dormant and aroused into disabling reality by the injury.

*Id.* at 265.

Here, as in *Finley*, there was no evidence that Campbell had ever been treated for his osteoarthritic knee. The ALJ wrote, "Prior to the work injury, there is no evidence of symptomatic right knee osteoarthritis." As noted above, Drs. Sharma, Johnson, and Muffly all recorded that Campbell had no problems with his right knee prior to his injury. The ALJ therefore had substantial evidence to support his finding that Campbell's osteoarthritis was not previously symptomatic. The first *Finley* factor is thus satisfied.

The second *Finley* requirement—that there be no impairment related to the condition pre-injury—is also satisfied. In support of this, Dr. Muffly wrote in his report explicitly that Campbell had no pre-existing active impairment. This, too, constitutes substantial evidence in support of the ALJ's finding regarding no pre-existing impairment relating to the osteoarthritis. The second *Finley* factor is thus also satisfied.

*B. Causation, Reasonableness, and Necessity*

Holding that the ALJ did not err in finding that Campbell had a pre-existing dormant condition, we must determine whether he had substantial evidence to support his conclusions regarding causation (i.e., that the workplace injury actually aroused the condition into disabling reality), reasonableness, and necessity. The ALJ determined that Campbell's workplace injury was the cause of the onset of his osteoarthritis symptoms, and that the

12

total knee replacement was reasonable and necessary to treat it. He did this using a patchwork of evidence (including Dr. Sharma's notes, Campbell's own testimony, and the timeline of events in the case) and relying on inferences from Dr. Madden's medical opinion evidence. The Perry County School Board argues that these inferences were improperly made under *Kingery v. Sumitomo Electric Wiring*, 481 S.W.3d 492 (Ky. 2015).

In *Kingery*, an injured worker, Sheila Kingery, was awarded workers' compensation for lifetime medical benefits to treat her workplace injury. *Id.* at 494. The injury—a spinal strain or sprain—occurred in 1989. *Id.* Twenty-three years later, Kingery continued to be treated for an increasing number of issues. *Id.* Her employer filed a medical fee dispute regarding the compensability of her use of the prescriptions Lorcet (a pain reliever), Skelaxin (used to treat muscle spasms), Xanax (used to treat panic disorders), and Celexa (an anti-depressant). *Id.* Kingery's employer filed an evaluation report from Dr. Randolph, who wrote that Kingery's "current subjective complaints of pain are unrelated to the mild sprain or strain injury caused by her work." *Id.* at 495. By contrast, "Kingery filed no medical evidence to rebut Dr. Randolph's opinions. Instead, she testified about her original work injury, work history, medical history, and current medical condition." *Id.* The ALJ nonetheless relied on Kingery's testimony over Dr. Randolph's to conclude that her conditions requiring treatment were caused by the 1989 workplace injury, and therefore were compensable. *Id.* This Court reversed the decision of the ALJ. *Id.* at 496. In so doing, we wrote, "ALJs are not permitted to rely on lay testimony,

13

personal experience, and inference to make findings that directly conflict with the medical evidence." *Id.*

Although this Court decidedly determined that "the ALJ's findings . . . were not based on substantial evidence and were insufficient to justify rejection of the medical evidence" in *Kingery*, we recognized that "it would not have required much medical evidence to support the ALJ's decision to disregard Dr. Randolph's opinions here. Some contrary report from Kingery's treating physician, for example, likely would have sufficed." *Id.* at 499, 500. Indeed, we indicated in *Kingery* that *any* differing medical opinion would have sufficed to support findings otherwise bolstered by non-medical evidence and inference. *See id.* (noting that absent uncontroverted medical evidence, the ALJ enjoys "immense discretion" to determine the weight of evidence for causation).

This Court considered the sufficiency of evidence again in *Parker v. Webster County Coal, LLC (Dotiki Mine)*, 529 S.W.3d 759 (Ky. 2017), *superseded by statute on other grounds as noted by Cates v. Kroger*, 627 S.W.3d 864 (Ky. 2021). There, as here, an ALJ found that an injured worker had a pre-existing dormant condition aroused into disabling reality by a workplace injury. *Id.* at 764. The evidence in *Parker* was internally inconsistent: "although Dr. Eggers referred to an injury as being the cause of Parker's back condition in his Form 107, he did not specify which injury." *Id.* at 765. In his first office note, however, Dr. Eggers "related Parker's back condition to the work injury." *Id.* Another doctor on whom the ALJ relied had conflicting reports regarding the injury's work-relatedness. *Id.* No single document contained the specific

findings of the ALJ, and there were internal inconsistencies within the records themselves. *See id.* Nevertheless, the ALJ "was free to consider" the totality of the proof together, believing or disbelieving the individual aspects of each record alongside Parker's testimony. *Id.* Although he relied on Dr. Eggers's nonspecific opinion, office notes, and Parker's testimony, this Court determined that the ALJ had sufficient evidence to support his conclusion that the injury must be compensated. *Id.* at 765–66.

Here, the ALJ made inferences based upon Dr. Madden's medical opinion. While Dr. Madden did not specify *which* surgery was reasonable and necessary or caused by the workplace injury, much like the doctor in *Parker*, he instead opined that Campbell's "injuries required surgical repair." Dr. Madden explicitly noted that the injury at issue in his report was work-related, as noted above, and he assessed a Whole Person Impairment that included no preexisting condition impairment rating in its calculation for the total knee replacement. The ALJ took this evidence, along with Dr. Sharma's office notes, Campbell's testimony, and the timeline of events, and he inferred that the total knee replacement was both caused by the workplace injury and was reasonable and necessary to treat it. Under *Kingery*, even Dr. Sharma's notes alone would have provided sufficient evidence to support the ALJ's determination. *See id.* at 500.

Although the ALJ relied in part on inferences to inform his ultimate determination, he did so in a reasonable manner and in light of medical evidence. ALJs are permitted to make inferences from the evidence and have

the sole discretion to determine the weight of evidence. *Jobe,* 544 S.W.3d at 631 (citations omitted). As we held in *Parker,* the ALJ's use of the evidence before him was appropriately within his power, even if, as Perry County argues, that evidence (in the narrative form) might be less than specific. To the contrary, it is clear to this Court from the record that although Dr. Madden's proffered "explanation" section may not include the exact verbiage demanded by Perry County, he does clearly indicate both causation and reasonableness within his report. Our holding is consistent with *Kingery,* since the ALJ relied on far more medical evidence than simply an office note to reach his conclusions (which this Court wrote would have likely been enough to constitute substantial evidence). *Kingery,* 481 S.W.3d at 500.

### III.    CONCLUSION

In the various reports, testimony, and medical evidence before him, the ALJ had sufficient evidence to conclude that Campbell's total knee replacement was reasonable and necessary. He also had sufficient evidence to conclude that Campbell's osteoarthritis which required a total knee replacement was a pre-existing condition brought into a disabling reality by his workplace injury. Because he relied on medical evidence, the ALJ was within his discretion to make inferences. Accordingly, we affirm the Court of Appeals.

VanMeter, C.J.; Bisig, Conley, Keller, Nickell, and Thompson JJ., sitting. All concur. Lambert, J., not sitting.

16

COUNSEL FOR APPELLANT, PERRY COUNTY BOARD OF EDUCATION:

Barry Lewis
Lewis and Lewis Law Offices

COUNSEL FOR APPELLEE, MARK CAMPBELL:

McKinnley Morgan
Wiley Gerald Vanover, Jr.
Morgan, Collins, Yeast & Salyer

COUNSEL FOR APPELLEES, HAZARD ARH AND DR. MUKUT SHARMA:

Denise Moore Davidson
Davidson & Associates

ADMINISTRATIVE LAW JUDGE:

Hon. Grant Stewart Roark

WORKERS' COMPENSATION BOARD:

Michael Wayne Alvey
Chairman