RENDERED:  MAY 26, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1027-WC

BLUELINX                                                              APPELLANT

|  | PETITION FOR REVIEW OF A DECISION |
|---|---|
| v. | OF THE WORKERS' COMPENSATION BOARD |
|  | ACTION NO. WC-19-64871 |

ESTATE OF DAVID WILLIAMS;
TRACEY BURNS, EXECUTRIX;
ELIJAH WILLIAMS, MINOR CHILD;
HONORABLE W. GREG HARVEY,
ADMINISTRATIVE LAW JUDGE;
AND THE KENTUCKY WORKERS'
COMPENSATION BOARD                                        APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, DIXON, AND TAYLOR, JUDGES.

DIXON, JUDGE:  Bluelinx petitions for review of a Workers' Compensation

Board (Board) decision affirming and remanding the Opinion, Award, and Order

rendered January 18, 2022, by the Administrative Law Judge (ALJ). After careful review of the briefs, record, and law, we affirm.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

On February 18, 2021, Tracey Burns, Executrix, filed the underlying Application for Resolution of a Claim – Injury seeking workers' compensation benefits, pursuant to KRS[1] 342.750, from Bluelinx on behalf of the Estate of David Williams and his minor son.

The following facts are undisputed. Williams, an employee of Bluelinx, suffered a work-related injury to his left ankle that necessitated surgery. His pre-operative cardiac exam was normal, and out-patient surgery was performed on October 25, 2019, without complications. Unfortunately, on October 27, 2019,[2] he returned to the hospital by ambulance and subsequently died. The death certificate cited complications of congestive heart failure (CHF) as the immediate cause of death. At the time of his death, Williams was 50 years old with an extensive medical history, including diagnoses of diabetes, obesity, CHF, hypertension, hyperlipidemia, and deep venous thrombosis (DVT).

---

[1] Kentucky Revised Statutes.

[2] We note that Bluelinx's brief records Williams' date of death as October 28, 2019; however, this appears to be in error as it is refuted by the medical records, both experts' statements, the testimony of Burns, and Bluelinx's pleadings before the ALJ.

On the issue of causation, Dr. Steven S. Wunder, a physiatrist retained by the estate, initially opined that "Williams' cardiac condition did not pose an immediate threat of death prior to [surgery and, g]iven the well-documented stable condition of [Williams' CHF], it is unlikely he would have succumbed to [CHF] on October 27, 2019, or a reasonable time thereafter, if he had not undergone the work-related surgery[.]"  Dr. Wunder also noted that "[t]he rate of death doubles in the perioperative time frame in those with a history of [CHF] and subsequent noncardiac surgery."

Bluelinx's medical expert, Dr. John D. Corl, a practicing interventional cardiologist, disputed that Williams had CHF, though he acknowledged that Williams had been diagnosed with the condition during a 2014 hospitalization.  Dr. Corl's objection was based on his review of the echocardiogram performed in 2014, the lack of confirmation by means of catheterization following Williams' subsequent diagnosis of liver abscesses, and the fact that Williams, who was not being treated for the condition, had no recurrent symptoms in the ensuing five years.  Instead, concluding that there was no direct causal relationship between the death and the surgery, Dr. Corl opined that Williams suffered a sudden cardiac death caused by his known and uncontrolled comorbid conditions – diabetes, hypertension, and obesity – as well as probable sleep apnea.

In response, Dr. Wunder submitted the following rebuttal opinion:

I am surprised by the statements of Dr. Corl, as it is irrefutable that cardiac complications occur in those undergoing major, noncardiac surgery. In fact, cardiac complications are common after noncardiac surgery, and include sudden cardiac death. The single largest cause of perioperative patients death, I would agree with Dr. Corl, would be major adverse cardiac events. The number of patients undergoing noncardiac surgery is wide and is growing, and annually, 500,000 to 900,000 of these patients experience perioperative cardiac death, nonfatal myocardial infarction, or nonfatal cardiac arrest. Noncardiac surgery is associated with significant cardiac morbidity, mortality, and cost.

[]

Patients undergoing noncardiac surgery are at risk for major perioperative cardiac events. Perioperative myocardial infarction occurs primarily during the first three days after surgery, as was noted here. Some theorize that patients are receiving narcotic therapy and may not experience cardiac symptoms during a myocardial infarction. On studies which have examined perioperative cardiac death, authors attributed the cause to myocardial infarction in 66[%] of the cases and to arrhythmia or heart failure in 34[%] of the cases. It is felt that surgery with associated trauma, anesthesia, analgesia, intubation, extubation, pain, bleeding, and anemia all initiate inflammatory, hypercoagulable stress and hypoxic states, that are associated with perioperative elevations in troponin levels and mortality.

[]

It is irrefutable that general anesthesia can initiate inflammatory and hypercoagulable states, and a sudden cardiac death syndrome. The stress of surgery also involves increased levels of catecholamines and

-4-

increased stress hormone levels. Perioperative hypoxia can also lead to myocardial ischemia. It is felt that 75[%] of deaths after noncardiac surgery are due to cardiovascular complications, as outlined by Dr. Corl, and I am certain he must be aware of this. I have enclosed a review article from the *New England Journal of Medicine* [entitled Cardiac Complications in Patients undergoing Major Noncardiac Surgery (hereinafter "the *Journal* article")] supporting that noncardiac surgery can precipitate complications such as death from cardiac causes, myocardial infarction or injury, cardiac arrest, or [CHF]. The number of patients receiving noncardiac surgery is increasing worldwide. More than 10 million adults worldwide have a major cardiac complication in the first 30 days after noncardiac surgery. As the [*Journal*] article points out, if perioperative death were considered as a separate category, it would rank as the third leading cause of death in the United States. I am surprised that Dr. Corl was not aware of that. Surgery initiates an inflammatory response, stress, hypercoagulability, activation of sympathetic nervous system, and hemodynamic compromise, all of which can trigger cardiac complications.

I am really confused as to what point Dr. Corl is trying to make. He seems to be arguing that [Williams] did not have [CHF]. He points out that no autopsy was done, and the cause of death was speculation. In addition to cardiac complications, sudden death can also be associated with [DVT] and pulmonary emboli, and [Williams] had a history of DVT already. Whichever complication his cause of death is attributed to, ([CHF] or pulmonary embolism), they occur at an increased frequency in the perioperative state. There is no way that Dr. Corl can make the statement that there was no direct causal relationship between [Williams'] noncardiac, left ankle surgery on October 25, 2019, and his death on October 27, 2019. Sudden cardiac death is a known complication of noncardiac surgery.

On January 18, 2022, the ALJ returned an opinion examining the

merits of the experts' competing opinions.

> A reading of the totality of the evidence is important. The [ALJ] interprets Dr. Wunder's opinion to be that Williams' surgery resulted in a cardiac event that caused his death. Dr. Corl also opines a cardiac event occurred that caused Williams['] death. However, he is of the opinion that the surgery did not result in or cause the cardiac event. Dr. Corl reasoned that events occur to all persons who die from sudden cardiac death but that does not mean that those events are causative.

> Here, the ALJ acknowledges Dr. Corl's superior qualifications on cardiac issues. However, Dr. Wunder has responded to Dr. Corl's opinion and cited evidence from the [*Journal* article]. The question is whether the surgery proximately caused the sudden cardiac death. Dr. Corl testified about statistical probability based on the comorbid factors. Williams had the same comorbid factors for years prior to the surgical procedure. Two days after being placed under general anesthesia he was found unresponsive and died.

> []

> The ALJ agrees with Dr. Corl that Williams did not have [CHF] and that he suffered sudden cardiac death. However, the ALJ finds Dr. Wunder's opinion that surgery caused the sudden cardiac event persuasive. This is true in light of the facts that Williams was not treating for [CHF], did not have pre-operative cardiac concerns or red flags. It is possible Williams might have had a sudden cardiac event on October 27, 2019, if he had not had surgery. It is also possible he could have had sudden cardiac [death] at any point for the years he carried the same comorbidities described by Dr. Corl. However, Williams did not have a sudden cardiac death until two days after surgery. Dr. Wunder has offered sufficient

-6-

evidence that noncardiac surgery is a known cause of
sudden cardiac death. The facts coupled with Dr.
Wunder's opinion are persuasive to the ALJ and cause
the ALJ to conclude Williams' death by a sudden cardiac
event was proximately caused by the work-related
surgical procedure.

Accordingly, the ALJ awarded death, dependent, and total disability
benefits. After its Petition for Reconsideration was denied, Bluelinx appealed; the
Board affirmed, though it remanded for an additional award of medical benefits;
and this action followed. We will introduce further facts as they become relevant.

## STANDARD OF REVIEW

Workers' compensation is governed by KRS Chapter 342. Disputes
over benefits are resolved by ALJs and reviewed on appeal by the Board. KRS
342.275; KRS 342.285. Our review of the Board's opinion is limited. "When
reviewing the Board's decision, we reverse only where it has overlooked or
misconstrued controlling law or so flagrantly erred in evaluating the evidence that
it has caused gross injustice." *GSI Commerce v. Thompson*, 409 S.W.3d 361, 364
(Ky. App. 2012) (citing *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685 (Ky. 1992)).

## LEGAL ANALYSIS

Bluelinx argues the Board erroneously concluded the ALJ's judgment
was supported by substantial evidence when the basis thereof – Dr. Wunder's
causation opinion and the *Journal* article upon which he relied – are devoid of any
probative value. In support, Bluelinx asserts that the facts espoused by Dr.

-7-

Wunder are unsupported, and thus unreliable, or are gleaned from the *Journal* article which Bluelinx contends is wholly irrelevant to the matter at hand. We are not convinced the Board erred.

To the extent Bluelinx claims that the ALJ was not permitted to rely on Dr. Wunder's rebuttal opinion or the *Journal* article, it is notable that Bluelinx neither challenged the admissibility of this evidence in the proceedings before the ALJ nor raised the Board's refusal to rule on the unpreserved claim in the matter at bar. As a general rule, "when the question is one properly within the province of medical experts, the [ALJ] is not justified in disregarding the medical evidence." *Kingery v. Sumitomo Elec. Wiring*, 481 S.W.3d 492, 496 (Ky. 2015) (quoting *Mengel v. Hawaiian-Tropic N.W. and Cent. Distribs., Inc.*, 618 S.W.2d 184, 187 (Ky. App. 1981)). Exceptions exist in cases involving observable causation, or if the medical opinion is the result of the claimant providing an inaccurate or misleading medical history. *Id.*; *Cepero v Fabricated Metals Corp.*, 132 S.W.3d 839 (Ky. 2004). This Court is unaware of a similar exception based solely on the expert's failure to source his opinion, and Bluelinx has cited no relevant authority in support. Here, whether the surgery was the proximate cause of Williams' death two days later is clearly an issue to be resolved by medical experts, and there is no contention that Dr. Wunder was not aware of the precise surgical procedure Williams underwent or his relevant medical history. Accordingly, the ALJ was

not, as Bluelinx asserts would be proper, permitted to wholly disregard Dr. Wunder's opinion and accept Dr. Corl's by default. Rather, the ALJ was required to weigh the evidence.

As the Kentucky Supreme Court explained in *Whittaker v. Rowland*, 998 S.W.2d 479, 481-82 (Ky. 1999):

> [T]his Court has construed KRS 342.285 to mean that the fact-finder, rather than the reviewing court, has the sole discretion to determine the quality, character, and substance of evidence[;] that an ALJ, as fact-finder, may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it came from the same witness or the same adversary party's total proof[;] and that where the party with the burden of proof was successful before the ALJ, the issue on appeal is whether substantial evidence supported the ALJ's conclusion[.] Substantial evidence has been defined as some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable men.

(Citations omitted.)

In its opinion affirming, the Board concluded that Dr. Wunder's opinion, which was given in terms of reasonable medical probability, satisfied this requirement. In so deciding, the Board noted consistent testimony from Dr. Corl's deposition that no surgical procedure using anesthesia is without risk; that a fatality could occur even from a low-risk ankle surgery; and that survival following surgery does not eliminate surgery as the potential cause of a patient's death occurring in the subsequent 24 to 48 hours (though Dr. Corl stated that this risk is

lower in an elective outpatient procedure than a more taxing procedure, such as a bypass). The Board additionally rejected Bluelinx's claim that the *Journal* article was irrelevant, concluding its applicability was an issue reserved for a medical expert, and held that the ALJ was free to conclude that it was germane to the case.

We perceive no error. Bluelinx's issue with the sourcing of Dr. Wunder's opinion is a matter of weight and credibility reserved for the ALJ, and it is not this Court's function to reweigh the evidence on a question of fact. *See id.* at 482. As for Bluelinx's challenges to the *Journal* article's relevance, Dr. Wunder's citation thereto, as well as his repeated quotation of its salient points, demonstrates his conclusion as an expert that it was relevant to his medical opinion regarding Williams' death. We also note that "ALJs are not permitted to rely on lay testimony, personal experience, [or] inference to make findings that directly conflict with the medical evidence[.]" *Kingery*, 481 S.W.3d at 496 (quoting *Mengel*, 618 S.W.2d at 187). Additionally, while Bluelinx would have this Court evaluate the applicability of the source material cited by the *Journal* article and then, without affording Williams the opportunity to explain or respond, conclude it – and by extension Dr. Wunder's opinion – did not constitute sufficient evidence, we are not permitted to consider matters not disclosed by the record. *Montgomery v. Koch*, 251 S.W.2d 235, 237 (Ky. 1952). Finally, we are unconvinced the evidence is insufficient to support the judgment merely because in one section of

the *Journal* article, which is a review of several different studies on the topic of cardiac complications following noncardiac surgery, the scope of a particular study is defined to the exclusion of the procedure at issue herein. Having reviewed the evidence, we cannot say that the Board's assessment is patently unreasonable or flagrantly implausible.

## CONCLUSION

Therefore, and for the foregoing reasons, the decision of the Board is AFFIRMED.

ALL CONCUR.

BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEES:

Mark R. Bush                            Haley S. Stamm
Samantha Steelman                       Ft. Mitchell, Kentucky
Ft. Mitchell, Kentucky